**The CITY OF NEW YORK, on behalf of itself and all other similarly situated municipalities, Plaintiff,**
**The City of Detroit, Plaintiff-Intervenor,**

v.

**William D. RUCKELSHAUS, as Administrator of the United States Environmental Protection Agency, Defendant.**

**Civ. A. No. 2466–72.**

United States District Court,
District of Columbia.

May 8, 1973.

670

Evan Davis, Asst. Corp. Counsel, New York City, admitted pro hac vice, for plaintiff.

Maureen P. Reilly, Asst. Corp. Counsel, Detroit, Mich., admitted pro hac vice, for plaintiff-intervenor.

David J. Anderson, Atty. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

GASCH, District Judge.

 This is an action for a declaratory judgment and mandamus to compel the defendant, William D. Ruckelshaus, until recently Administrator of the United States Environmental Protection Agency ("the Administrator") to comply with the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816 (hereafter termed "the Act").[1] Plaintiff is the City of New York, suing on behalf of itself and all similarly situated municipalities within the State of New York. The City of Detroit has been granted leave to intervene as a party plaintiff seeking the same relief. The action is brought pursuant to § 505(e)

1. This action was originally brought against William D. Ruckelshaus, who was serving as Administrator at that time. During the pendency of the action, Mr. Ruckelshaus resigned and his successor has not yet been appointed and confirmed. By operation of Rule 25(d), Fed. R.Civ.P., the Acting Administrator is automatically substituted as the defendant. The action continues unabated unless the new Administrator comes forward with evidence showing such a discontinuance of his predecessor's policy as to make the action moot. See Rule 25(d), 1961 Notes of the Advisory Committee on Rules; 3B J. Moore, Federal Practice, ¶ 25.09[3], at 25–402 (2d ed. 1969). Since no such showing has been made in the instant case, the actions of Mr. Ruckelshaus are chargeable to the Acting Administrator for purposes of this action, and the Court's order is binding upon the Acting Administrator and his successors in office.

of the Act and 5 U.S.C. §§ 701–706; jurisdiction is alleged on the grounds of 28 U.S.C. §§ 1331, 1332, and 1361.

Plaintiff and plaintiff-intervenor allege that § 205(a), taken together with § 207, of the Act requires the Administrator to allot among the states the sums of $5 billion for fiscal year 1973 and $6 billion for fiscal year 1974, thereby making such sums available for obligation on sewage treatment works construction approved by the Administrator for federal funding. It is further alleged that the Administrator has violated this statutory requirement by promulgating, at the express direction of the President of the United States, a regulation, effective December 8, 1972,[2] which allotted among the states for fiscal years 1973 and 1974 "sums not to exceed $2 billion and $3 billion respectively." The case is now before the Court on plaintiff's motion to determine that this suit may be maintained as a class action, defendant's motion to dismiss, and the motions of plaintiff and plaintiff-intervenor for summary judgment.[3] Also before the Court for consideration are the pleadings, oppositions, affidavits, and argument by counsel in open Court.

The Court's characterization and analysis of the issues in the case will be clearer if the mechanism set up under the Act for funding the construction of sewage treatment works is briefly outlined. The Act reverses the normal procedure whereby sums are appropriated by Congress and thereafter contractually obligated by the appropriate agency. Instead, Congress has, in § 207, authorized certain specific sums to be appropriated to carry out the purposes of Title II of the Act, Grants for Construction of Treatment Works. The Administrator is required by § 205 to allot the sums among the states according to a time schedule and needs formula set up under the Act.[4] (Whether the full sums authorized to be appropriated must be allotted or only a portion of them—the size of the portion being within the Administrator's discretion—is the central issue disputed by the parties.) Once allotted, the sums become available for obligation, i. e., contract authority exists up to those amounts. The Administrator reviews grant applications submitted by States and municipalities for federal funding of particular waste treatment projects to determine whether they satisfy criteria set forth in the Act, e. g., in § 204. Once the Administrator approves the plans, specifications, and estimates for a project, a contractual obligation arises to pay the federal share allocable to that project.[5] Funds are then appropriated to liquidate the obligations as they fall due; the final step, actual disbursement of the funds, is then made. It is clear from this sequence that *allotment* is not tantamount to *expenditure* or even commitment of the funds.

Another feature of the Act which is of some importance in the resolution of issues before the Court is the reallotment provision in § 205(b)(1) of the Act.

2. 37 Fed.Reg. 26282, § 35,910–1(a) (1972).

3. The contentions of the plaintiff-intervenor are substantially the same as those made by the plaintiff. In the interest of brevity, references throughout will be solely to the plaintiff unless the context requires otherwise.

4. According to § 205(a) sums are to be allotted among the States "in the ratio that the estimated cost of constructing all needed publicly owned treatment works in each State bears to the estimated cost of construction of all needed publicly owned treatment works in all of the States." Congress has supplied the figures for de-termining the ratios to be used for the fiscal years ending June 30, 1973, and June 30, 1974. (Table III of House Public Works Committee Print No. 92–50). For subsequent fiscal years, the allotments are to be made in accordance with a revised cost estimate submitted by the Administrator to Congress and "approved by law specifically enacted hereafter."

5. Section 202(a) sets the federal share of the cost of construction of projects, as approved by the Administrator, at 75 percent. Section 203 of the Act specifies that the Administrator's approval creates contractual obligations on the part of the United States.

Once allotted to a State, sums are available for obligation for approved projects there "for a period of one year after the close of the fiscal year for which such sums are authorized." If for any reason the sums allotted are not fully obligated within that period, they are to be reallotted "generally on the basis of the ratio used in making the last allotment of sums under this section." Such reallotted sums remain available for obligation and are added to the State's allotment for the next fiscal year. Any sums authorized but not allotted at the appropriate time are lost to the State under the provisions of this Act. Thus, by refusing to allot the full sums authorized, the Administrator controls the absolute amount (as opposed to the rate) of spending without regard to the standards set forth in, e. g., § 204, for determining whether sums should be obligated.

█ Having set forth the framework of the Act within which the dispute now before the Court has arisen, the Court will proceed to the issues. First to be dealt with are jurisdictional issues raised in the defendant's motion to dismiss and his opposition to plaintiff's motion for summary judgment. Defendant contends that this Court lacks the requisite jurisdiction because the doctrine of sovereign immunity bars the suit and because the action fails to present a justiciable case or controversy. The Court does not agree with these contentions and will deal with them only briefly.[6]

█ Two well-settled common law exceptions to the doctrine of sovereign immunity are set forth in two cases cited by defendant, Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and Larson v. Domestic & Foreign Commerce Corporation, 337 U. S. 682, 689–690, 69 S.Ct. 1457, 93 L. Ed. 1628 (1949); and plaintiff's action falls squarely within the exception covering suits challenging actions by federal officers .which go beyond the scope of their statutory powers. Defendant is not aided by the general rule set forth in Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), to the effect that where the judgment sought "would expend itself on the public treasury or domain, or interfere with the public administration," the suit is in reality brought against the sovereign; for as subsequent discussion will reveal, the relief sought by plaintiff in this action does not require the *expenditure* of unappropriated public funds (or indeed of any public funds at all), nor will it interfere with the lawful exercise of defendant's discretionary powers under the Act.

A second reason for rejecting the sovereign immunity defense as a bar to this action is the fact that plaintiff is seeking review in part on the basis of the Administrative Procedure Act, 5 U.S.C. §§ 701–706; the rule in this Circuit is that the A.P.A. constitutes a waiver of sovereign immunity in actions to which it applies. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 385, 424 F.2d 859, 873 (1970); Constructores Civiles de Centroamerica, S.A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972). Defendant has sought to distinguish *Scanwell* by contending that there was no question there of any "disposition" of government funds, whereas the instant case presents a "demand" for such funds. As already indicated, this argument must fail because defendant has misconstrued the nature of the relief sought. Plaintiff is demanding only that funds be *allotted* as, in its view, Congress required.

█ Defendant contends that this action fails, for two reasons, to present a justiciable case or controversy. First

---

6. It should be noted that these same contentions were made recently in motions to dismiss by the defendant in three consolidated civil actions before Judge Jones of this Court. Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C., 1973).

In those suits, as in the instant case, plaintiffs were challenging the actions of a federal officer on the ground that they were in violation of his statutory authority; Judge Jones rejected the defendant's contentions and proceeded to the merits of the case.

it is argued that the action is hypothetical and premature and hence does not fall within the limits of federal court jurisdiction as defined by Article III of the Constitution. It is true that Article III confines federal courts to the adjudication of cases and controversies and forbids the rendering of advisory opinions. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Where a declaratory judgment is sought, the plaintiff must show a "substantial controversy between parties having adverse legal interests of sufficient immediacy and reality" to warrant its issuance. Maryland Casualty Company v. Pacific Coal & Oil Company, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Defendant contends that because plaintiff has no guarantee that projects for which it seeks funding under the Act will be approved, refusal to allot, and thus make available for obligation, the full amounts authorized to be appropriated in § 207 of the Act does not amount to action that is adverse to any real or immediate interests of plaintiff. This argument fails on several grounds. Plaintiff has filed an affidavit of the Commissioner of the Department of Water Resources for the City of New York averring that the City has received approval from the United States Environmental Protection Agency (EPA) for two waste treatment projects, and that because of the reduced allotments, plaintiff's share of available federal funds "will permit only a token start toward completion." (Affidavit of Martin Lang dated April 3, 1973, ¶¶ 5–6).[7] Defendant has not disputed these assertions of fact. Even were plaintiff's grant application still under study, however, there would be more than a merely speculative injury; for as affidavits filed by both plaintiff and plaintiff-intervenor indicate, the reduction in allotments has re-sulted in serious planning delays that will necessarily retard the development of sewage treatment facilities. (Affidavit of Martin Lang, dated February 8, 1973, ¶ 11; affidavit of Gerald Remus, dated March 15, 1973, ¶ 12). The seriousness of the planning problem was understood by Congress. It was one of the reasons for utilizing the device of allotment, thereby making funds available for obligation, in lieu of the ordinary appropriations procedure.

Congressman William Harsha, one of the managers of the bill, observed during debate on a proposed amendment to H.R. 11896[8] which would have substituted the normal appropriations process for the allotment mechanism that "it is essential that the States, the interstate agencies and the cities have both the ability for and a basis for long-range planning, construction scheduling and financing waste treatment plants, including the sale of bonds that they have to sometimes negotiate." 118 Cong.Rec. H2727 (daily ed. March 29, 1972). When there is uncertainty concerning how much will be allotted in a given year, municipalities cannot properly plan the scale of projects for which to seek federal funding.

Still another way in which plaintiff is injured by the Administrator's refusal to allot the full amount of the sums authorized to be appropriated by § 207 lies in the permanent loss of funds not allotted at the appropriate time. Such funds can not thereafter be made available for obligation even if grant applications which, in the Administrator's determination, meet all the requirements of the Act are submitted and the current allocations are insufficient to pay the authorized federal share.

Considering all of the ways in which plaintiff's interests are imminently threatened by the Administrator's action under challenge here, it seems clear that

---

7. Attached as Exhibit "B" to the affidavit is a copy of a letter dated March 1, 1973, from Gerald M. Hansler, Regional Administrator, EPA, announcing approval of the plaintiff's grant application for the two projects.

8. H.R. 11896 was the House version of the bill later enacted as P.L. 92–500, 86 Stat. 816, the provisions of which are disputed in the instant case.

there exists an injury sufficiently concrete to create a real controversy in which plaintiff has a genuine stake; and in ruling on the legality of the Administrator's action alleged to be the cause of this injury, the Court is not rendering a mere advisory opinion.

 Defendant's other ground for urging the Court to find the subject matter of this action nonjusticiable is the contention that the matter at issue is a "political question" which the Court is barred from considering by reason of the doctrine of separation of powers. Certainly it is true that this Court could not decide a case if it presented a political question. Powell v. McCormack, 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 88 L.Ed. 1385 (1939). Criteria to be used in determining whether a political question is presented have been set forth by the Supreme Court in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). There Mr. Justice Brennan, writing for the majority, declared:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of · government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of em-

barrassment from multifarious pronouncements by various departments on one question.

 The Administrator contends that at least two of the considerations listed by Mr. Justice Brennan are applicable to the instant case, namely, (1) something "very close" to a "textually demonstrable" commitment of power to control spending in the grant of executive power in Article II of the Constitution; and (2) a "lack of judicially discoverable and manageable standards for resolving" the question whether particular expenditures should be made. Even assuming *arguendo* that the Constitution gives to the President and his subordinates unreviewable authority to determine whether particular expenditures authorized by Congress should be made at a particular time, it is clear that the instant case presents none of the problems cited by the defendant. Counsel's position on this point must fail simply because he has not correctly characterized the issue before the Court. The Court is not being called on to determine whether the Administrator should *spend* any given amount of money for sewage treatment works. Rather the Court is being asked by plaintiff to require the Administrator to perform what it alleges to be a purely ministerial duty under the Act, that of allotting—and thus making *available for obligation*—the sums authorized to be appropriated in Section 207 of the Act.[9] There is no "textually demonstrable constitutional commitment" of this responsibility to the executive branch, and there is no difficulty in discovering standards for resolving the issue before the Court. Either the Administrator is required by the Act to allot the full amount of the sums authorized to be appropriated in § 207 or he is not so bound.

9. For this reason the instant case is distinguishable from Housing Authority of San Francisco v. U. S. Department of Housing and Urban Development, 340 F. Supp. 654 (N.D.Cal.1972), cited · by the Administrator. In *Housing Authority* the Court found the issue presented to be non-

justiciable because it found in the statute in question a legislative "intention of allowing spending discretion in the executive" and no manageable standards for determining whether the discretion had been abused. 340 F.Supp. at 656.

■ The Court is not overstepping its authority in deciding this question, for as our Court of Appeals recently declared: "In our overall pattern of government, the judical branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch." National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S. App.D.C. 274, 280, 443 F.2d 689, 695 (1971). Even more recently, the Eighth Circuit Court of Appeals, citing *inter alia* the opinion in *National Automatic Laundry* determined that a challenge to the legality of a decision by the Secretary of Transportation to defer obligation of funds already apportioned to the State of Missouri under the Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 101 et seq. (1970), presented a justiciable issue. The question was whether the Secretary had any discretion at all so to act. The State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir., 1973).

It seems clear, then, that for the reasons given and on the basis of the authorities cited, this Court is not barred from reaching the merits of this case either by the doctrine of sovereign immunity or by a lack of a justiciable case or controversy. Hence, it is appropriate now to proceed to the question raised in plaintiff's summary judgment motion, i. e., whether the Administrator had discretion to refuse to allot the sums authorized to be appropriated in § 207 of the Act, or—put the other way around—whether allotment of those sums is a purely ministerial act. The Court may resolve this question on summary judgment because the defendant, in his Statement submitted pursuant to Local Rule 9(h), has not set forth any specific facts showing that there is a genuine issue for trial. *See* Rule 56(e), F.R.Civ.P.

■ Resolution of the issue whether the Administrator is required under the Act to make the allotments in question here turns primarily on the meaning of § 205(a) and § 207 of the Act, which read as follows:

"ALLOTMENT

"SEC. 205. (a) Sums authorized to be appropriated pursuant to section 207 for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after the date of enactment of the Federal Water Pollution Control Act Amendments of 1972. Such sums shall be allotted among the States by the Administrator in accordance with regulations promulgated by him, in the ratio that the estimated cost of constructing all needed publicly owned treatment works in each State bears to the estimated cost of construction of all needed publicly owned treatment works in all of the States. For the fiscal years ending June 30, 1973, and June 30, 1974, such ratio shall be determined on the basis of table III of House Public Works Committee Print No. 92–50. Allotments for fiscal years which begin after the fiscal year ending June 30, 1974, shall be made only in accordance with a revised cost estimate made and submitted to Congress in accordance with section 516(b) of this Act and only after such revised cost estimate shall have been approved by law specifically enacted hereafter.

"AUTHORIZATION

"SEC. 207. There is authorized to be appropriated to carry out this title, other than sections 208 and 209, for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,000,000, and for the fiscal year ending June 30, 1975, not to exceed $7,000,000,000."

In urging its interpretation of these sections, plaintiff places emphasis on the phrase "shall be allotted" in § 205(a), contending that the use of "shall" rather than "may" makes plain the mandatory character of this section. The Adminis-

trator defends his interpretation (namely, that he has discretion to decide how much to allot) primarily on the grounds that H.R. 11896, the bill from which § 205 and § 207 of the Act are derived, was amended in conference by the insertion of the phrase "not to exceed" before each of the sums specified in § 207 and by the deletion of the word "all" before the phrase "Sums authorized to be appropriated" in § 205(a); both amendments, it is contended, are substantive changes meant to give the Administrator the discretion to withhold allotments as he has done. Given the arguments of the parties, a "plain meaning" analysis is obviously inadequate to the task at hand. Rather, the Court must examine the relevant legislative history to determine whether Congress intended to give the Administrator the kind of discretion he claims to have under the Act. The Wilderness Society v. Morton, 156 U.S. App.D.C. ——, 479 F.2d 842 (1973), at 855.

■ Of particular importance are the views of sponsors of the legislation in question. See, e. g., First National Bank of Logan, Utah v. Walker Bank and Trust Co., 385 U.S. 252, 261, 87 S. Ct. 492, 17 L.Ed.2d 343 (1966); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); Kansas City, Mo. v. Federal Pacific Electric Co., 310 F.2d 271 (8th Cir. 1962), cert. denied, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171, and 373 U.S. 914, 83 S.Ct. 1297, 10 L. Ed.2d 415. Specifically, the Court can properly look to the expressed views of Congressman William Harsha, who is the ranking minority member of the House Committee on Public Works, which reported H.R. 11896, and who was also the bill's floor manager and a member of the conference committee which worked out the final language of the Act, and the views of Senator Edmund Muskie, who is Chairman of the Senate Subcommittee on Air and Water Pollution, which reported the Senate version, S. 2770, and who was floor manager of that bill and a member of the conference

committee. It was Congressman Harsha who sponsored the amendments on which the Administrator relies.

An examination of pertinent portions of congressional debates quoted by both plaintiff and defendant reveals that Congressman Harsha intended his amendments not to make any substantive change in the bill but rather to clarify (or "emphasize," to use his own term) the point that the Administrator was to have discretion regarding the *obligation and expenditure* of funds authorized to be appropriated under the Act. Thus, in explaining his amendments, Congressman Harsha said: "I want to point out that the elimination of the word "all" before the word "sums" in section 205(a) and insertion of the phrase "not to exceed" in section 207 was intended by the managers of the bill to emphasize the President's flexibility to control the *rate of spending*." 118 Cong.Rec. at H9122 (daily ed. October 4, 1972) (emphasis added). Moreover, it is clear from an exchange of remarks by Congressman Robert Jones of Alabama, Chairman of the conference committee, Congressman Gerald Ford of Michigan, and Congressman Harsha, that this intent was made known to the House, which later voted in favor of the legislation as amended. That exchange is recorded as follows:

Mr. GERALD R. FORD.

Mr. Speaker . . . I think it is vitally important that the intent and purpose of section 207 is spelled out in the legislative history here in the discussion on this conference report.

As I understand the comments of the gentleman from Ohio [Harsha], the inclusion of the words in section 207 in three instances of "not to exceed" indicates that is a limitation. More importantly that it is not a mandatory requirement that in 1 year ending June 30, 1973, there would be $5 billion and the next year ending June 30, 1974, $6 billion and a third year ending June 30, 1975, $7 billion *obligation or expenditure?*

Mr. HARSHA. I do not see how reasonable minds could come to any other conclusion than that *the language means we can obligate or expend up to that sum*—any thing up to that sum but not to exceed that amount. \* \* \*

Mr. GERALD R. FORD. Mr. Speaker, I would like to ask the distinguished chairman of the subcommittee and *the chairman of the House conferees* whether he agrees with the gentleman from Ohio (Mr. Harsha).

Mr. JONES of Alabama.

. . . My answer is "yes." Not only do I agree with him, but the gentleman from Ohio offered this amendment which we have now under discussion in the committee of conference, so there is no doubt in anybody's mind of the intent of the language. It is reflected in the language just explained by the gentleman from Ohio (Mr. Harsha).

Mr. GERALD R. FORD. Mr. Speaker, this clarifies and certainly ought to wipe away any doubts anyone has. *The language is not a mandatory requirement for full obligation and expenditure up to the authorization figure in each of the 3 fiscal years.*

*Id.*, at H9123 (emphasis added).

The Administrator is not supported in his interpretation of the Act's legislative history by citing remarks of Congressman Harsha concerning authority for Executive "impoundment" of funds. During the debates on H.R. 11896, Congressman Harsha took note of recent impoundments by the Executive branch of moneys allocated among the States under the Federal-Aid Highway Act of 1956, and made the following observation:

[T]he Committee on Public Works is acutely aware that moneys from the highway trust fund have been im-

pounded by the Executive. Expenditures from the highway trust fund are made in accordance with similar contract authority provisions to those in this bill. Obviously *expenditures and appropriations* in the water pollution control bill could also be controlled. However, there is even more flexibility in this water pollution control bill because we have added "not to exceed" in section 207, as I indicated before.

Surely, if the administration can impound moneys from the highway trust fund which does not have the flexibility of the language of the water pollution control bill, it can just as rightly *control expenditures from the contract authority produced in this legislation by that same means.*

*Id.*, at H9122 (emphasis added).

The impoundments of Federal-Aid Highway Act moneys referred to by Congressman Harsha were of funds already allotted, i. e., the controls were being exercised at the obligation level rather than at the allotment level.[10] Thus, these comments tend to support the position of the plaintiff rather than that of the defendant in regard to which administrative functions are discretionary and which mandatory under the Act which this Court is called on to construe. It seems obvious from the remarks just quoted that, as Senator Muskie observed:

Under the amendments proposed by Congressman WILLIAM HARSHA and others, the *authorizations for obligational authority* are "not to exceed" $18 billion over the next 3 years. Also, "all" sums authorized to be obligated need not be committed, though they must be allocated. These two provisions were suggested to give the Administration some flexibility concerning the obligation of construction grant funds.

*Id.*, at S16871 (emphasis added).

---

10. It should be noted that the Court of Appeals for the Eighth Circuit has construed the Federal-Aid Highway Act as requiring obligation of allotted funds, and has thus declared the impoundments referred to by Congressman Harsha to be illegal. State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, (8th Cir., 1973).

The President appears to have concurred in the views of the sponsors concerning § 205 and § 207 of the Act, for in his message explaining his veto of the bill, he stated:

> Certain provisions of . . . [the bill] confer a measure of *spending discretion and flexibility* upon the President, and if forced to administer this legislation I mean to use those provisions to put the brakes on budget-wrecking expenditures as much as possible.

> But the law would still exact an unfair and unnecessary price from the public. For I am convinced . . . that the pressure for full funding under this bill would be so intense that funds approaching the *maximum authorized* amount could ultimately be claimed and paid out, no matter what technical controls the bill appears to grant the Executive. 118 Cong.Rec. at H10266 (daily ed. October 18, 1972) (emphasis added).

In other words, the President believed that the Act required the Administrator to allot the full amount authorized, and he feared that once the Administrator had made the allotments, he might be under great pressure to approve grant applications up to the amount of the allotments. Congress, believing that the needs to which the Act was addressed were sufficiently urgent that expenditure of the full amounts authorized might be necessary,[11] and believing further that the Administrator was given sufficient discretion to avoid any hasty and improvident obligation of funds, passed the bill over the President's veto.

The question whether the entire amount should be *obligated* is, of course, not before this Court. The only question is whether the full allotments must be made, and the answer to that on the basis of the foregoing review of the sponsors' comments seems clear. The language of the pertinent sections of the Act, read in the light of their legislative history, clearly indicates the intent of Congress to require the Administrator to allot, at the appropriate times, the full sums authorized to be appropriated by § 207.[12] Hence, this Court has no choice other than to declare that § 205(a) of the Act requires the Administrator to allot among the states $5 billion for fiscal year 1973 and $6 billion for fiscal year 1974.

The only question remaining for decision is whether plaintiff's action may be maintained as a class action on behalf of all similarly situated municipalities within the State of New York. Defendant has opposed maintenance of this suit as a class action solely on the ground that plaintiff does not satisfy subsections (a)(3) and (a)(4) of Rule 23, Fed.R.Civ.P., i. e., it is contended that plaintiff's claim is not typical of those of the proposed class members and that plaintiff cannot adequately represent the class. The Court does not find these points well taken. Differences in amounts which various municipalities might receive from the State allotment have no bearing on the legal issue

---

11. The central purpose of the Act as set forth in the first section is to effectuate "the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." § 101(a)(1). Congressman Harsha recognized that achieving this goal might well require spending the entire $18 billion authorized to be appropriated; and he observed: "To say we can't afford this sum of money is to say we can't afford to support life on earth." 118 Cong.Rec. H10268 (daily ed. October 18, 1972).

12. As previous discussion has indicated, pp. 675–676, *supra*, this construction of the Act does not infringe upon any prerogative of the Executive branch. The Court is thus not confronting any delicate constitutional question of the kind which Mr. Justice Brandeis, in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936), counseled courts to avoid. Hence defendant's reliance on *Ashwander* as authority for the proposition that the Act should be construed so as to enhance his powers at the expense of those of the Congress is not well taken.

of whether the allotment as a whole should be increased. Neither can such differences make the City of New York something less than an adequate representative of the class as required by Rule 23(a)(4). Competition for shares of a common fund does not bar a class action on behalf of all competitors when the relief sought would lead to an increase in the total amount of that fund. Berman v. Narragansett Racing Association, 414 F.2d 311, 317 (1st Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 682, 24 L. Ed.2d 681 (1970). The Court finds that plaintiff satisfies all the requirements of Rule 23(a) and 23(b)(1)(A), (b)(1)(B), and (b)(2); accordingly, the suit can be maintained on behalf of the proposed class.