George E. BROWN, Jr., Plaintiff,

v.

William D. RUCKELSHAUS, Administrator of the Environmental Protection Agency, Defendant.

CITY OF LOS ANGELES, Plaintiff,

v.

William D. RUCKELSHAUS, Administrator of the Environmental Protection Agency, Defendant.

Nos. 73–154–AAH, 73–736–AAH.

United States District Court, C. D. California.

Sept. 7, 1973.

Terrence Goggin, and Thorpe, Sullivan, Clinnin & Workman, Los Angeles, Cal., for plaintiff George E. Brown, Jr.

Frank Wagner, Deputy City Atty., for plaintiff City of Los Angeles.

James R. Dooley, Asst. U. S. Atty., and Harlington Wood, Jr., Deputy Atty. Gen., for defendant William D. Ruckelshaus.

OPINION AND ORDER DENYING PLAINTIFF GEORGE E. BROWN JR.'S AND CITY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT WILLIAM D. RUCKELSHAUS' MOTION TO DISMISS

HAUK, District Judge.

These two matters, arising upon virtually the same factual allegations and determinable by the same legal and judi-

cial considerations, were argued and are now being decided as consolidated cases.

On January 26, 1973, Congressman George E. Brown, Jr. filed a complaint on behalf of himself and all other California citizens and residents against William D. Ruckelshaus, the former Administrator of the United States Environmental Protection Agency, in connection with the allotment procedure of the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500 (Oct. 18, 1972) 86 Stat. 816 [hereinafter cited as the Act]. The City of Los Angeles followed suit on April 4, 1973, against the same defendant.

These actions are part of a series of substantially similar lawsuits that have been filed against the EPA across the United States.[1] In turn this collection is one corner of the well-known Presidential impoundment issue in which over $13 billion are presently frozen.[2]

The facts are not in dispute. Congress passed the Water Pollution Control Act Amendments on October 4, 1972. They authorize appropriations totalling $11 billion for waste treatment plant construction grants for fiscal years 1973 and 1974. President Richard Nixon vetoed the bill, S. 2770, thirteen days later.[3] His veto message indicated that the measure was inflationary because "the pressure for full funding under this bill would be so intense that funds approaching the maximum authorized amount could ultimately be claimed and paid out no matter what technical controls the bill appears to grant the Executive." [4]

Congress promptly overrode the veto.[5] Then on November 28, 1972, Mr. Ruckelshaus announced that in line with the President's instructions, he would allot only $5 billion of the authorized $11 billion for treatment plant construction projects for fiscal years 1973 and 1974. Those reduced allotments in fact were promulgated on December 4.[6] This final action by the EPA is what has been labelled as Presidential impoundment and what the plaintiffs are challenging in these suits.

The procedural history of these actions is as follows: The EPA, through the United States attorney, filed motions to dismiss in both cases; George Brown Jr. and the City of Los Angeles then filed motions for summary judgment. A hearing occurred on July 16, 1973.

The issues are, *seriatim,* 1) whether sovereign immunity bars the actions, 2) whether the cases present a justiciable controversy, 3) whether the plaintiffs have standing to maintain their suits, and finally 4) whether the plaintiffs are entitled to relief on the merits.

## SOVEREIGN IMMUNITY

The Defendant asserts that the United States, as sovereign, is immune

1. These cases include City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.C.D.C. 1973); Campaign Clean Water v. Ruckelshaus, 361 F.Supp. 689 (E.D.Va.1973); Minnesota v. Fri (D.C.Minn.1973); Klein v. Ruckelshaus, (D.C.D.C.1973), Civ.No. 151–73.

2. *E. g.,* "Power of the Purse," New York Times, October 27, 1972; "Business Bulletin: A Special Background Report on Trends in Industry and Finance," Wall Street Journal, November 30, 1972; "The Impoundment Battle," Washington Post, February 6, 1973; *See generally* Impoundment of Appropriated Funds By The President, Joint Hearings before the Ad Hoc Subcommittee on Impoundment of Funds of the Committee on Government Operations and the Subcommittee on Separation of

Powers of the Committee on the Judiciary, United States Senate, 93rd Cong., 1st Sess. (1973) [Hereinafter cited as *Joint Hearings*] and Executive Impoundment of Appropriated Funds, Hearings Before the Subcommittee on Separation of Powers of the Committee on the Judiciary, United States Senate 92d Cong., 1st Sess. (1971) [Hereinafter cited as *Hearings*]. A thorough, but not exhaustive, list of impoundment-related cases throughout the country appears at *Joint Hearings, supra,* at 908–1010.

3. 8 Pres.Doc. 1541 (Oct. 23, 1972).

4. 8 Pres.Doc. 1531, 1532 (Oct. 23, 1972).

5. 118 Cong.Rec. S 18546, S 18554 (Daily Ed. Oct. 17, 1972); 118 Cong.Rec. H 10266, H 10273 (Daily Ed. Oct. 18, 1972).

6. 40 Fed.Reg. §§ 35.910, 910–1, 910–2.

from suit unless it consents to be sued. United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); United States v. King, 395 U.S. 1, 89 S. Ct. 1501, 23 L.Ed.2d 52 (1969). Moreover, a suit nominally against a government officer may, in reality, be a suit against the United States if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947). More recently, the Supreme Court said that sovereign immunity also attaches if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); Hawaii v. Gordon, 373 U.S. 57, 58, 82 S.Ct. 1052, 10 L.Ed. 2d 191 (1963).

■ The short answer to this problem is that while these two cases meet this definition, they also fall within a well-settled exception to the doctrine, found in Dugan v. Rank, *supra*. There the Court indicated that a suit may be brought against a United States officer to challenge an action which allegedly exceeds statutory authority or, if within the scope of authority, is premised upon a power which is unconstitutional. See also Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). Both complaints allege that the EPA has exceeded its statutory authority in impounding the authorized funds. If sustained on the merits, Congressman Brown and Los Angeles would fall within the exception we note here. Campaign Clean Water v. Ruckelshaus, 361 F.Supp. 689 (E.D.Va.1973); City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.C.D.C.1973). Moreover, the general rule enumerated in Land v. Dollar, *supra*, does not help the Defendant. That case bars suits where the judgment would expend itself on the public treasury or domain or interfere with the public administration. Here the suit is in reality brought against the sovereign, requesting relief that does not require the *expenditure* of any unappropriated funds. They only ask for the allotment of the funds, and the EPA retains the discretion not to incur any obligation to expend them. There is no interference with the lawful exercise of Defendant's discretionary powers under the Act. City of New York v. Ruckelshaus, *supra*.

## CASE OR CONTROVERSY

### A. Political Question

Little exists to convince the Court that this issue is a political question that we should avoid. Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); City of New York v. Ruckelshaus, *supra*; Campaign Clean Water v. Ruckelshaus, *supra*. The Plaintiffs only are asking us to interpret a statute, to determine whether the specific Act in question mandates spending policies in contravention to those announced by the Administrator of the EPA. The Supreme Court has clarified the standard by which a political question may be identified:

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*, at 217, 82 S.Ct. at 710.

Yet Justice Brennan made it clear that he was talking about political questions, not political cases. "The courts cannot

reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.* Our task here is exactly what the judiciary is supposed to do: interpret the law. There is no issue involving "executive power"; nor is the Court being asked to supervise the operations of the EPA, which concededly would muddle any judicially discoverable and manageable standards for resolving the issue.

"In short the courts must decide whether the Constitution or a particular statute empowers the Executive to impound appropriated funds. This is precisely the sort of determination that the Supreme Court made in [Kendall v. United States, 12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181 (1838)] and in [Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934).] When the language of an appropriation is not itself dispositive of the issue, the court may examine the effect of impounding on the purpose that Congress sought to achieve. When the executive's action clearly thwarts the congressional purpose, the Constitution provides a clear basis for resolving the controversy." Presidential Impounding of Funds: The Judicial Response, 40 U. Chi.L.Rev. 328, 346 (1973). The Water Pollution Act in question here is not necessarily dispositive on its face, and it is our job to help interpret it.

B. Is the action premature?

An elementary judicial principle is that the courts may not adjudicate cases that are hypothetical or premature. Golden v. Zwickler, 394 U.S. 103, 89 S. Ct. 956, 22 L.Ed.2d 113 (1969). Defendant urges us to conclude that since nothing actually has happened yet to either Plaintiff, there is no controversy. This is bad logic. The Act's legislative history shows that the financial scheme was adopted to facilitate long-range planning, a necessary element in developing water treatment plants. 118 Cong.Rec. H. 2727 (March 29, 1972); City of New York v. Ruckelshaus, *supra.* "Because funds are allotted on a yearly basis, it appears that those funds not allotted in the appropriate year are forever lost." Campaign Clean Water v. Ruckelshaus, *supra.* "However, funds allotted for a given year but not obligated may be reallotted the following fiscal year. Section 205(b)(1)." *Id.*, n. 1. As Judge Miles Lord said in Minnesota v. Fri (D.Minn.1973), ". . . the issues are ripe, pressing and hotly in dispute. Only those funds that are allotted in a fiscal year are available to be obligated for projects in the State. In this instance, over $60 million may be lost forever to Minnesota after June 30, 1973."

■ Congress recognized that "it is essential that the states, the interstate agencies and the cities have both the ability for and a basis for long-range planning, construction scheduling and financing waste treatment plants, including the sale of bonds that they have to sometimes negotiate." 118 Cong.Rec.H. 2727 (daily ed. March 29, 1972). When there is uncertainty concerning how much will be allotted in a given year, municipalities cannot properly plan their project schedules and submit accurate proposals for federal funding. City of New York v. Ruckelshaus, *supra.* This is ample support for the proposition that the two cases before us present an actual case and controversy within the requirements of the Constitution.[7]

7. U.S.Const. art. III § 2
   Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State; —between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

## STANDING

The standing question represents the first hurdle that neither Plaintiff can clear. The main difficulty is their failure to demonstrate that the EPA's refusal to allot the full authorized sums is injuring them or will injure them in the future. And this is the fatal difference between the case at bar and the prior decisions in which the plaintiffs have been awarded standing. In Minnesota v. Fri, *supra*, Plaintiff submitted affidavits showing that more than 140 applications were in abeyance. "To meet the needs of the pending applications would require far in excess of the money allotted," the court noted. "It is anticipated that even a greater number of applications will be submitted for the next fiscal year. Even if these programs would otherwise qualify for grants, the lack of allotted funds would preclude the Administrator from granting them funds."[8]

Similarly, in City of New York v. Ruckelshaus, *supra,* the Court was careful to note that "[p]laintiff has filed an affidavit of the Commissioner of the Department of Water Resources for the City of New York averring that the City has received approval from the United States Environmental Protection Agency (EPA) for two waste treatment projects, and that because of the reduced allotments, plaintiff's share of available federal funds 'will permit only a token start toward completion.' (Affidavit of Martin Lang dated April 3, 1973, ¶¶ 5–6). Defendant has not disputed these assertions of fact. Even were plaintiff's grant application still under study, however, there would be more than a merely speculative injury; for as affidavits filed by both plaintiff and plaintiff-intervenor indicate, the reduction in allotments has resulted in serious planning delays that will necessarily retard the development of sewage treatment facilities [citing two affidavits]. The seriousness of the planning problem was understood by Congress. It was one of the reasons for utilizing the device of allotment, thereby making funds available for obligation, in lieu of the ordinary appropriations procedure." City of New York v. Ruckelshaus, *supra.*

In Campaign Clean Water v. Ruckelshaus, *supra,* the president of Campaign Clean Water submitted an affidavit indicating that the organization was created through the efforts of several groups, including the Chesapeake Bay and its Tributaries Watermen's Union, whose members derive their income from shellfishing. Also in the group were the Virginia Beach Innkeepers Association, waterfront property owners, and other individuals who engaged in boating and swimming on Virginia's waters.

"They allege that their interests are impaired by the discharge of untreated or inadequately treated sewage from overly burdened waste treatment plants into the waters of Virginia. In particular, it is alleged that individual members of the groups who have formed and contributed to Campaign Clean Water, Inc., have suffered economic injury from contaminated waters caused by sewage discharge from several plants operated by the Hampton Roads Sanitation District. Members of the Chesapeake Bay and its Tributaries Watermen's Union, for example, allege that shellfish beds in the area have been rendered unusable by such contamination. The injuries of the various members of Campaign

---

8. "In an affidavit by Duane L. Anderson, Head of the Construction Grants Unit of the MPCA and the State Administrator in charge of the implementation of Title II of the Federal Water Pollution Control Act, it is stated that the money allocated to Minnesota for 1973 is sufficient to fund 13 grant applications and partially fund the St. Cloud project. If the full $101 million were allotted, there would be sufficient funds to take care of 22 grant applications and again partially fund the St. Cloud project. In 1974, it is estimated that if the full sums are allotted, there would be sufficient money to fund 64 projects instead of only 5 projects if the present allotment stands." State of Minnesota v. Fri, *supra.* This sort of clear injury, meticulously documented, is absent in the two actions before this Court.

Clean Water, Inc., are tied to the acts of the defendant by the allegation, supported by a letter from the General Manager of the Hampton Roads Sanitation District, that the withholding of funds will have a disastrous effect on future plans for water treatment plants on Virginia's waters and will thus allow the injury to the plaintiff's interests to continue." *Id.*

What is the situation with Congressman Brown and the City of Los Angeles? Neither party has shown affidavits indicating that proposals have been rejected because of frozen funds. In fact the City of Los Angeles does not even respond to this issue in its brief.

■ We find this omission fatal. There is no proof that any act by the President or the EPA has hurt, is injuring, or will impair the City or Congressman Brown. We cannot conclude from the record that either Plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ." Baker v. Carr, *supra*, 369 U. S. at 204, 82 S.Ct. at 703. While recent cases have clarified the requirements of standing, *e. g.*, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the United States Supreme Court still expects certain minimum standards to be met. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Without any affidavits, those standards are not satisfied here.[9]

■ Parenthetically, we note that George Brown Jr.'s status as a congressman does not place him in any better position than the rest of the general public. Gravel v. Laird, 347 F.Supp. 7, 9 (D.C.D.C.1972); *cf.* Muskrat v. United

States, 219 U.S. 346, 31 S.Ct. 250, 55 L. Ed. 246 (1911).

Congressman Brown's class action allegation also must fail. The statute and its history clearly demonstrate that no such actions are allowable. Section 505 of the Act reads as follows:

### "CITIZEN SUITS

"Sec. 505. (a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

"(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

"(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 309(d) of this Act.

"(b) No action may be commenced

"(1) under subsection (a)(1) of this section—

"(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i)

9. Actually it is possible that the absence of affidavits could result in a holding that the two cases before us are not justiciable be-

cause no one has demonstrated that an actual case or controversy exists.

to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

"(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

"(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 306 and 307(a) of this Act. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

"(c)(1) Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.

"(2) In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

"(d) The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

"(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)."

What quickly becomes apparent is the passage stating that one may sue only "on his own behalf."[10] The legislative history bluntly states that this section was inserted to prevent the exact situation Congressman Brown is trying to create.

"The section is drawn to avoid problems raised by class action provisions of the Federal rules of civil procedure, specifically by Rule 23. Section 505 does not authorize a 'class action.' Instead, it would authorize a private action by any citizen or citizens acting on their own behalf. Questions with respect to traditional 'class' actions often involve: (1) identifying a group of people whose interests have been damaged; (2) identifying the amount of total damage to determine jurisdiction qualification; and (3) allocating any damages recovered. None of these points is appropriate in citizen suits seeking abatement of violations of water pollution control requirements. It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available." 1972 U.S.Code Cong. and Admin.News, at p. 3746.

Because of our decision regarding standing, it is not necessary to reach the merits in this case. Nevertheless, the Court feels that even on the merits, nei-

---

10. Another point is that any suit against the Administrator involving an alleged failure to perform a ministerial act may not be commenced prior to 60 days after the Plaintiff has given notice of such action to the Administrator. This latter requirement has not been met; that alone might be grounds for dismissal.

ther Plaintiff could prevail, for reasons to which we now turn.

## ARE THE PLAINTIFFS ENTITLED TO RELIEF ON THE MERITS?

The statutory process by which water pollution funds become available is important. Three steps are involved. First is authorization (Section 207). Next comes the allotment process (Section 205(a)). Finally, state and local public agencies apply for grants from the allotted moneys. The EPA approves the application, and the government has incurred a contract obligation. At that point Congress has incurred a debt and appropriates the necessary funds to cover it. (Sections 201(g), 203, 204).

The Defendant's contention is simple and persuasive: the language of Sections 205 and 207, coupled with the Act's legislative history, indicate that Congress did not intend to force the EPA to allocate the maximum authorized sums.

Section 207 states:

"There is authorized to be appropriated to carry out this title, other than sections 208 and 209, for the fiscal year ending June 30, 1973, not to exceed $5 billion, for the fiscal year ending June 30, 1974, not to exceed $6 billion, and for the fiscal year ending June 30, 1975, not to exceed $7 billion."

Then Section 205(a) provides:

"Sums authorized to be appropriated pursuant to section 207 for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after the date of enactment of the Federal Water Pollution Control Act Amendments of 1972 . . ."

Frankly, these words are quite clear in their intent. Authorized sums must be allotted, and the sums may not exceed the maximum that Congress authorized. The statute requires no more than that, nor does the law. Indeed the law indicates that a court must give effect to every clause, sentence, and word of a statute, lest we defeat the clear congressional intent. United States v. Menasche, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); United States v. Alpers, 338 U.S. 680, 681–682, 70 S.Ct. 352, 94 L.Ed. 457 (1970).

■ The legislative history of the Act supports our conclusion that the statute simply does not require that the EPA allot every authorized dollar. Two amendments made by the Conference Committee are important. First, the words "not to exceed" were added before the amounts authorized by Section 207. The second change was in Section 205(a). The original house bill that the conference committee considered read as follows:

"All sums authorized to be appropriated . . . shall be allotted by the Administrator . . ."

The Conference Committee deleted the word "all."

Certainly these two amendments point to a desire to limit funds, not maximize them. The passage "sums authorized to be appropriated . . . shall be allotted" hardly means that the entire amount must be disgorged, and the phrase "not to exceed" connotes limitation, not disbursement. On its face the legislation's history supports the obvious statutory meaning: that not all authorized sums must be allotted among the states.

Furthermore, Section 205(a) of the Act refers only to the allotment process. We cannot understand in light of that fact how the Plaintiffs can argue that the withholding authority attaches only at the appropriation, or contract stage of the financial scheme. Even the nominal defendant William Ruckelshaus asserted that once funds are allotted among the states, he has no power to

control expenditures by curtailing or deferring specific project approvals.[11]

Turning to the underlying hearings that preceded the Act and its amendments, we must conclude again that the congressional intent was to allow the Chief Executive to withhold funds he felt were unnecessary.[12] Representative William Harsha, a member of the Conference Committee and the sponsor of the two amendments in question, stated on the House floor before the conference substitute passed,

"Furthermore, I want to point out that the elimination of the word 'all' before the word 'sums' in section 205(a) and insertion of the phrase 'not to exceed' in section 207 was intended by the managers of the bill to emphasize the President's flexibility to control the rate of spending.[13]

.     .     .     .     .     .

"Furthermore, let me point out, the Committee on Public Works is acutely aware that moneys from the highway trust fund have been impounded by the Executive. Expenditures from the highway trust fund are made in accordance with similar contract authority provisions to those in this bill. Obviously expenditures and appropriations in the water pollution control bill could also be controlled. However, there is even more flexibility in this water pollution control bill because we have added 'not to exceed' in section 207, as I have indicated before.[14]

"Surely, if the administrator can impound moneys from the highway trust fund which does not have the flexibility of the language of the water pollution control bill, it can just as rightly control expenditures from the contract authority produced in this legislation by that same means.

.     .     .     .     .     .

"The committee recognizes there are many competing national priorities. That is the very reason the committee has placed in this legislation the flexibility that is needed for the executive branch." 118 Cong.Rec. H 9122 (daily ed. Oct. 4, 1972).

Water pollution control, as Harsha pointed out, cannot exist in a vacuum. It must be controlled and we believe that

---

11. 16 Meet the Press No. 48, at 9 (Dec. 3, 1972.

12. The Act is the product of some 71 days of hearings, involving 465 witnesses, 605 written statements, and totally over 10,550 pages. It is impossible to cull through all of this here, but our research, and that of counsel for both sides, has revealed what we believe are the most important highlights.

13. The Plaintiffs here, and the holding of City of New York v. Ruckelshaus, *supra* note 1, argue that Section 205 of the Act is the product of a desire to allow the President to control the rate of spending. See remarks by Representative Harsha, 118 Cong.Rec. H 9122 (Oct. 4, 1972), and Don Clauson, 118 Cong.Rec. H 10272 (Oct. 18, 1972). This is understood; however, they go on to argue that the rate of spending itself means the amount allotted as it is spent over a long period of time. In other words, they claim, once the amount is allotted, it ultimately must be spent. The President, they say, controls the rate only at the statutory third stage—when the EPA approves contracts and incurs an actual obligation.

We disagree with this interpretation. The amendments involving the words "all" and "not to exceed" occurred to make sure the President could control the rate of spending, and we see no reason why the President cannot control the amount of money he ultimately disburses. Rate, then, implies more than just a time factor, especially because the EPA has operated on the assumption that once the dollars are allotted, they are irretrievably committed. *Supra* note 11. It is safe to predict substantial litigation if the Administrator allocates funds with no intention of spending them. Such pressure would erode the controls Congress intended to give the Chief Executive.

14. The Eighth Circuit has ruled that the President cannot impound the highway trust funds on extrinsic grounds (in that case, because of inflation pressures), State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973). But we still feel that the additional amendments in the Water Pollution Control Act, coupled with the clarity of the statute's wording, permits Presidential discretion in connection with spending under the Water Pollution Control Act.

Congress intended that the President, acting through the EPA, perform as he has.

A subsequent colloquy bolsters this position. The following dialogue involved not only Mr. Harsha, but also Minority Leader Gerald Ford and Robert E. Jones of Alabama, the Chairman of the House conferees on the bill and Chairman of the Subcommittee that considered P.L. 92–500:

> Mr. Ford: Mr. Speaker, the gentleman from Ohio has made a very excellent presentation and as I listened I thought he answered the major question that I have in my mind. I am for the conference report, but I think it is vitally important that the intent and purpose of section 207 is spelled out in the legislative history here in the discussion on this conference report.
>
> As I understand the comments of the gentleman from Ohio, the inclusion of the words in section 207 in three instances of 'not to exceed' indicates that is a limitation. More importantly that it is not a mandatory requirement that in 1 year ending June 30, 1973, there would be $5 billion and the next year ending June 30, 1974, $6 billion and a third year ending June 30, 1974, $7 billion obligation or expenditure?
>
> Mr. Harsha: I do not see how reasonable minds could come to any other conclusion than that the language means we can obligate or expend up to that sum—anything up to that sum but not to exceed that amount. Surely, if the Executive can impound moneys under the contract authority provision in the highway trust fund, which does not have the flexible language in this bill, they could obviously do it in this instance.
>
> Mr. Ford: Mr. Speaker, I would like to ask the distinguished chairman of the subcommittee and the chairman of the House conferees whether he agrees with [Mr. Harsha].

> Mr. Jones: Mr. Speaker, if the gentleman will yield. My answer is 'yes.' Not only do I agree with him, but the gentleman from Ohio offered this amendment which we have now under discussion in the committee of conference, so there is no doubt in anybody's mind of the intent of the language. It is reflected in the language just explained by the gentleman from Ohio [Mr. Harsha].
>
> Mr. Ford: Mr. Speaker, this clarifies and certainly ought to wipe away any doubts anyone has. The language is not a mandatory requirement for full obligation and expenditure up to the authorization figure in each of the 3 fiscal years. Therefore, without any reservations Mr. Speaker, I support the conference report. [118 Cong.Rec. H 9123 (daily ed. Oct. 4, 1972).

We are not impressed with the statements by Senator Muskie, to the effect that while the President need not spend the authorized sums, he must allot them *in toto*. See 118 Cong.Rec. S 16871 (daily ed. Oct. 4, 1972); S 18546, S 18549 (daily ed. Oct. 17, 1972). His logic flies in the face of the statutory scheme, as we have already seen, and against the vast majority of his colleagues. Even Senator Gaylord Nelson, another supporter of the original bill, recognized the flexibility granted to the President:

> "The measure authorizes $18 billion over the next 3 fiscal years for the key program of Federal aid for municipal waste treatment plant construction.
>
> "As I understand it, in a response to State complaints that earlier Federal money commitments were not being met, the money authorized by this legislation could be obligated for the aid grants to municipalities without annual action by Congress.
>
> "Only if the President's Office of Management and Budget or the Congress specifically directed otherwise would the money not be available at

the levels in the legislation, according to my understanding." 118 Cong.Rec. S 16888 (daily ed. Oct. 4, 1972).

Another member of the Conference Committee, Senator Howard Baker of Tennessee, also said that "Congress has gone out of its way to make it clear to the President that the funds authorized by the water pollution bill did not have to be spent in their entirety." 118 Cong.Rec. S 18546 (daily ed. Oct. 17, 1972). Another conferee and manager of the bill in the Senate, Kentucky's John Sherman Cooper, opined that "the option of impoundment is still open, and the President could utilize that option." 118 Cong.Rec. S 18551 (daily ed. Oct. 17, 1972). And even after President Nixon vetoed the bill, there was even more verbiage to the effect that the administration can impound the funds.[15]

This Court is fully aware of the opposite decisions around the country. With all due respect to the judges who wrote those opinions, we believe that they are not correct. Neither the amendments nor the sponsors' statements received proper attention in any of the decisions. No one has convinced us that when a legislature removes the word "all" from the phrase, "All sums authorized to be appropriated shall be allotted," they mean that every penny must be spent.

Nor has anybody argued successfully that adding the phrase "not to exceed" before a sum means anything more than that an upper limit must be imposed. Even an appropriation act, which this is not, is not tantamount to a mandate to spend. 42 Op.Atty.Gen. 32 (1967). In fact the late Clarence Cannon once reported to his colleagues in the House that the appropriation of a given amount for some project "constitutes only a ceiling upon the amount which should be expended for that activity . . . [It is the] responsibility [of every Government official] to so control and administer the activities under his jurisdiction as to expend as little as possible out of the funds appropriated." [16] Thus an appropriation places an upper limit on spending, but not a floor. This in fact is recognized public policy, codified obliquely in the Antideficiency Act 31 U.S.C. §§ 665(c) and 701. It follows that if appropriations do not represent a *carte blanche* against the United States treasury, authorizations should not receive different treatment. Moreover, we feel that the sponsors' statements did not receive proper treatment in the recent *contra* decisions. When there is ambiguity in interpreting a statute (and we do not think there is here), the Supreme Court tells us that "[i]t is the

---

15. 118 Cong.Rec. H 10268 (Daily Ed., Oct. 18, 1972).

"Mr. Harsha: Furthermore, Mr. Speaker, we have emphasized over and over again that if Federal spending must be curtailed, and if such spending cuts must affect water pollution control authorizations, the administration can impound the money.

"I want to point out that the elimination of the word 'all' before the word 'sums' in section 205(a) and insertion of the phrase 'not to exceed' in section 207 was intended to emphasize the President's flexibility to control the rate of spending.

"I might add, while this legislation does provide for contract authority, the present administration recommended contract authority in H.R. 18779, the bill I introduced in behalf of the administration some time ago.

"Furthermore, let me point out, the Committee on Public Works is acutely aware that moneys from the highway trust fund have been impounded by the Executive. Ex-

penditures from the highway trust fund are made in accordance with similar contract authority provisions to those in this bill. Obviously expenditures and appropriations in the water pollution control bill could also be controlled. However, there is even more flexibility in this water pollution control bill because we have added 'not to exceed' in section 207, as I indicated before.

"Surely, if the administration can impound moneys from the highway trust fund which does not have the flexibility of the language of the water pollution control bill, it can just as rightly control expenditures from the contract authority produced in this legislation by that same means."

In connection with the Missouri Highway Commission decision and its effect here, see *supra*, note 14.

16. House Appropriations Committee Report on the General Appropriation Bill, 1951, H. Rept. 1797, 81st Cong., 2d sess. p. 9 (1951).

sponsors that we look to when the meaning of the statutory words is in doubt." Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394, 71 S.Ct. 745, 750, 95 L.Ed. 1035 (1951). This means that Congressman Harsha's words should receive the controlling weight over Senator Muskie's. And this ignores the fact that the other conferees agreed with Harsha. See S & E Contractors, Inc. v. United States, 406 U.S. 1, 13 n. 9, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972); N. L. R. B. v. Fruit and Vegetable Packers, Local 760, 377 U.S. 58, 66–68, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964).

We thus decide that even if these two cases were to proceed to the merits, neither party could compel the director of the Environmental Protection Agency to allot the funds authorized to be appropriated by the Act. Perhaps it is fitting to terminate this opinion, part of a heated battle against President Nixon's policies, with a statement from a former President who ironically was one of Mr. Nixon's philosophical opposites: "While our statutory system of fund apportionment is not a substitute for item or blanket veto power, and should not be used to set aside or nullify the expressed will of Congress, I cannot believe that you or Congress as a whole would take exception to either of these purposes which are common to sound business management everywhere. In other words, the mere fact that Congress, by the appropriation process, has made available specified sums for the various programs and functions of the Government is not a mandate that such funds must be fully expended. Such a premise would take from the Chief Executive every incentive for good management and the practice of commonsense economy. This is particularly true in times of rapid change in general economic conditions and with respect to programs and activities in which exact standards or levels of operation are not and cannot well be prescribed by statute."[17]

The author was President Franklin D. Roosevelt.

Accordingly, in line with Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, Congressman George E. Brown Jr.'s motion for summary judgment is denied and the Defendant William D. Ruckelshaus' motion to dismiss is granted. Similarly, the motion for summary judgment filed by the City of Los Angeles is denied and Mr. Ruckelshaus' motion to dismiss that case is granted. This opinion shall also constitute findings of fact and conclusions of law, Rule 52, F.R.Civ.P.

Let judgment be entered accordingly.

---

17. This letter was in connection with complaints about the old Bureau of the Budget's curtailment of certain programs of the Agricultural Marketing Administration. It is reproduced in part in Supplemental National Defense Appropriation, 1944, Hearings before a Subcommittee of the Senate Committee on Appropriations, 78th Cong., 1st sess., on H.R. 3598 (P.L. 78–216), p. 739 (1944).