494 F.2d 1033
 6 ERC 1177, 161 U.S.App.D.C. 114, 4
Envtl. L. Rep. 20,188
 The CITY OF NEW YORK on behalf of itself and all other
similarly situated municipalities within the State
of New York, City of Detroit, (Party Plaintiff),
v.
Russell B. TRAIN, as Administrator of the United States
EnvironmentalProtection Agency, Appellant.
 No. 73-1705.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Nov. 2, 1973.
Decided Jan. 23, 1974, Certiorari Granted April 29, 1974,
See 94 S.Ct. 1991.
 
 Edmund W. Kitch, Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Harold H. Titus, Jr., U.S. Atty., and Walter H. Fleischer, Atty., Dept. of Justice, were on brief for appellant.
 Evan A. Davis, Asst. Corp. Counsel, New York City, for the City of New York, of the bar of the Court of Appeals of New York, pro hac vice by special leave of court with whom John R. Thompson, New York City, and James R. Atwood, Washington, D.C., were on the brief, for appellee.
 Robert E. Killian, Atty. Gen. of the State of Connecticut filed a brief on behalf of the State of Connecticut, as amicus curiae.
 Nicholas C. Yost. Deputy Atty. Gen. of the State of California filed a brief on behalf of the State of California, as amicus curiae.
 Before TAMM, ROBINSON and WILKEY, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 This suit was brought as a class action by the City of New York (hereafter 'City') on behalf of itself and all other similarly situated municipalities within the State of New York. The defendant below was Mr. Russell B. Train, Administrator of the Environmental Protection Agency[1] (hereafter, 'The Administrator'). The City of Detroit, Michigan, was granted leave to intervene as party plaintiff. On May 8, 1973, the United States District Court for the District of Columbia granted City's motions for summary judgment and to maintain this lawsuit as a class action, concurrently denying the Administrator's motion to dismiss. The Administrator brings this appeal from the trial court's ruling, and, for the reasons stated infra, we affirm.
 
 I. BACKGROUND
 
 2
 This is but one of a number of cases[2] presently pending across the country concerning allocation of funds under the Federal Water Pollution Act Amendments of 1972[3] (hereafter, 'Act'). In order to place the instant dispute in its proper context it is necessary to understand the legislative history of the Act. The Act revised the procedures for funding federal aid to local governments for the purpose of the construction of sewage treatment plants. Prior to the Act's passage, these expenditures were first authorized and then specifically funded by the normal Congressional appropriation process. Due to the nature of this process, local governmental recipients could not ascertain the exact amount they would receive until after the formal appropriation. As a result, local governments were hesitant to enter construction contracts with only a hope that federal monies would be ultimately passed to them.[4]
 
 
 3
 The Act was passed to insure that ultimate grantees could rely in advance on the amounts available. Section 101(a) declares that to clean the nation's waters 'it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works.' To this end, the Act created a funding mechanism known as 'contract authority'.[5] The technical operation of the sections of the Act relating to this 'contract authority' spending is at the heart of this dispute and a thorough understanding of the mechanism is, therefore, imperative.
 
 
 4
 There are six distinct steps involved in funding under the Act: (1) Authorization by Congress to appropriate funds (207); (2) 'allotment' of these authorized sums among the various states, pursuant to formula (205); (3) review by the Administrator of project proposals submitted by a particular municipality (203, 201(g)(2) and 204); (4) 'obligation' by the Administrator of the federal share of an approved project (203 and 201(g)(1)); (5) appropriation by Congress of funds to pay obligated contracts as they fall due; and (6) disbursement of the funds (203(b) and (c)).
 
 
 5
 After the Act was enacted into law, over Presidential veto,[6] the President wrote to the Administrator, directing him to allot '$2 billion of the amount authorized for the fiscal year 1973, and no more than $3 billion of the amount authorized for the fiscal year 1974.'[7] The Administrator followed orders and allocated a total of $5 billion[8] for both fiscal years. It is this final action by the Administrator which has been labeled 'Presidential impoundment'[9] and which was successfully challenged in the trial court by plaintiff-appellee City.
 
 II. THE TRIAL COURT'S RULING
 
 6
 Plaintiff-appellee City[10] basically argued below that 205(a) and 207 of the Act, read together, required the Administrator to allot among the states the sums of $5 billion and $6 billion in fiscal years 1973 and 1974 respectively. Once allotted, these amounts would then be available for obligation under the Act. By the allotment of only $5 billion total for fiscal years 1973 and 1974, it is argued that the Administrator violated the statute.
 
 
 7
 The Administrator, defendant-appellant, made several arguments in the trial court. He argued that (1) the trial court lacked jurisdiction, the suit being barred by the doctrine of Sovereign Immunity; and (2) that the claim failed to present a justiciable case or controversy because (a) it was 'hypothetical and premature' and (b) it stated a 'political question' thus beyond the jurisdiction of the court. The trial court found against the Administrator on all these arguments,[11] but appellant brings before this court only two issues: (1) whether Sovereign Immunity bars this suit; (2) whether 205(a) and 207 of the Act confer discretion on the Administrator to determine the sum to be allotted under the Act.
 
 III. SOVEREIGN IMMUNITY
 
 8
 It is our opinion that the trial court was correct in holding that City's suit is not barred by the principle of sovereign immunity. Counsel for the Administrator conceded at oral argument that the law of this circuit, Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873 (1970); Constructores Civiles de Centroamerica v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183, 1191 (1972), permits the maintenance of this suit with the Administrator as defendant.[12] In view of this concession, we need do no more than state that we hold the suit is not barred. We agree with the reasoning of the trial court and here adopt the opinion below to the extent that it treats the Sovereign Immunity question.[13]
 
 IV. THE MEANING OF 205(a) AND 207
 
 9
 We now turn to the analysis which is central to resolution of the matter sub judice, i.e. the meaning of 205(a) and 207 of the Act which are reproduced in the margin supra. Appellee-City relies upon the phrase 'shall be allotted' in 205(a), arguing that by the use of 'shall', rather than a word plainly conferring greater discretion (e.g. 'may'), Congress intended that allotment under the Act be mandatory. The Administrator, on the other hand, asserts that changes in these sections of the Act, prior to its enactment, show a legislative intent to confer discretion upon the Administrator. H.R. 11896, the bill from which 205 and 207 ultimately were derived, was amended in conference. The phrase 'not to exceed' was inserted before each specified sum in 207 and the word 'all' was deleted from before the phrase 'sums authorized to be appropriated' in 205(a). Appellant argues that these changes indicate that Congress intended to give the Administrator absolute discretion over whether and how much to allot under the Act.
 
 A. The Overall Intent of the Act
 
 10
 Initially, it is to be noted that a 'plain meaning' analysis will not suffice here. As the Administrator admits 'there is no happy marriage between the provisions of the statute . . ..'[14] We agree for we can find no way to harmonize the term 'shall allot' and the language concerning sums 'not to exceed.' Accordingly, we turn to an analysis of relevant legislative history to ascertain whether the legislature intended any discretion at the 'allotment' stage of the funding mechanism. Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 134, 479 F.2d 842, 855 (1973).
 
 
 11
 The legislative history is extensive, covering some 1700 pages.[15] Of particular importance are the views expressed by Congressman William Harsha and Senator Edmund Muskie, sponsors of the legislation.[16] The amendments upon which the Administrator relies were authored and sponsored by Congressman Harsha, and are commonly referred to as the 'Harsha Amendments.'After a careful reading of the relevant legislative materials, we believe that throughout the lengthy legislative process, Congress manifested an intent to specifically commit federal funds. It did so in recognition of the necessity of assuring the states that federal aid would be available. The need was recognized in 1971 by the Senate subcommittee considering water pollution:
 
 
 12
 At a bare minimum the credibility of the existing federal commitment must be re-established by backing words of authorization with monies of appropriation. Whenever the nation seeks to encourage cities to plan and construct improvements which require many years to complete, the Congress must build reliability into its federal grant incentives. Major facilities cannot be stopped in midstream. A change in federal grant policy to establish a reliable commitment is vital but is not the only change that can and should be made in the federal legislative and regulatory approach to water pollution abatement.
 
 
 13
 U.S. Senate, Committee on Public Works, Water Pollution Control Legislation Hearings, pt. 1, at 521 (1971).
 
 
 14
 This commitment continued and the subcommittee on Air and Water Pollution concluded in 1972:
 
 
 15
 The language of subsection (b) of Section 207 provides that funds authorized for fiscal years 1973, 1974, and 1975, shall be available for obligation by contract upon their allocation to the States. The importance of assured Federal financial support to the achievement of the objectives of this title and to our national purpose of cleaning up polluted waterways cannot be overstated. The task is a massive one in terms of the work to be done and the funds to be expended.
 
 
 16
 S.Rep. No. 92-414, 92nd Cong., 1st Sess. 35 (1971).
 
 
 17
 The two principal sponsors of the Act both clearly articulated their belief that federal money must be spent, and, in fact, strongly indicated their recognition that the full $18 billion would be allotted. Senator Muskie stated:
 
 
 18
 The conferees spent hours and days studying the problem of financing the cleanup effort required by this new legislation. The members agreed in the end that a total of $18 billion had to be committed by the Federal Government in 75 percent grants to municipalities during fiscal years 1973-75. That is a great deal of money; but that is how much it will cost to begin to achieve the requirements set forth in the legislation . . ..
 
 
 19
 Mr. President, to achieve the deadlines we are talking about in this bill we are going to need the strongest kind of evidence of the Federal Government's commitment to pick up its share of the load. We cannot back down, with any credibility, from the kind of investment in waste treatment facilities that is called for by this bill. And the conferees are convinced that the level of investment that is authorized is the minimum dose of medicine that will solve the problems we face.
 
 
 20
 118 Cong.Rec. S 16870-71 (daily ed. October 4, 1972).
 
 
 21
 It is evident that Congress was concerned with possible inflationary effects. However, it is just as evident that Congress believed that the full $18 billion expenditure was necessary. Senator Cooper[17] stated:
 
 
 22
 I believe that the funding levels for these and other provisions of the bill, which total over $24 billion-- subject to the usual presidential responsibility for evaluating these needs in relation to other national priorities-- are responsible, are consonant with the magnitude of our Nation's water quality problems, and will not have an inflationary effect upon our economy . . ..
 
 
 23
 . . . .th
 
 
 24
 Contract authority is provided for up to $5 billion in 1973, $6 billion in 1974, and $7 billion in 1975. This will be allocated to the States on the basis of the Environmental Protection Agency's annual assessment of needs established without regard to budgetary limitations and other nonwater quality factors.
 
 
 25
 Id. at S 16881. Senator Bayh also emphasized the necessity of a full Federal commitment:
 
 
 26
 The conferees agreed to accept the House passed authorizations for grants to the States for the construction of waste treatment plants, including sewage collection systems. This is construction which is absolutely essential if we are to make any meaningful progress toward the national goals established in the bill. The total authorization for this purpose is $18 billion over the 3 fiscal years ending in 1975. There is no doubt that this money is needed, for without substantial authorizations he bill would be little more than a series of empty promises. The amounts allocated for grants for construction of treatment works will be distributed to the States on the basis of need, with the Federal share of construction costs being 75 percent.
 
 
 27
 Id. at S 16892-93. Congressman Johnson made clear the intent of the House to spend $18 billion to meet the water pollution problem. In his report to the House, he stated:
 
 
 28
 You may recall that the bill that passed this body last March called for authorizing a little more than $24.6 billion, the Senate bill authorized $20 billion, and the administration requested $6 billion. The conferees have agreed on essentially the same figures as in the House bill, $24.6 billion for the period through fiscal 1975. A total of $18 billion of this sum is for construction grants, and breaks down not to exceed $5 billion for fiscal 1973, $6 billion for fiscal 1974, and $7 billion for fiscal 1975.
 
 
 29
 Naturally, the large difference in what the administration asked, and what the conference bill provides, raises the question of why the substantial discrepancy?
 
 
 30
 There is only one answer to that and it is that if we set out to do this job there is no way we can accomplish it without paying the price. If we want clean water, we have to pay for clean water. If we want the States and cities to move aggressively ahead in building waste treatment plants they must have Federal aid, and they must have confidence that Washington will continue to live up to its commitments.
 
 
 31
 Id. at H 9130.
 
 
 32
 The President, in his veto message to Congress on October 17, shared this view that the Act would require ultimate expenditure of $18 billion for sewage treatment under 207 of the Act:
 
 
 33
 I am compelled to withhold my approval from S. 2770, the Federal Water Pollution Control Act Amendments of 1972-- a bill whose laudable intent is outweighed by its unconscionable $24 billion price tag. My proposed legislation, as reflected in my budget, provided sufficient funds to fulfill that same intent in a fiscally responsible manner. Unfortunately the Congress ignored other vital national concerns and broke the budget with this legislation.
 
 
 34
 118 Cong.Rec. S 18534 (daily ed. October 17, 1972).
 
 
 35
 In the discussion of the Act prior to its being enacted over the veto, Congress again clearly expressed its intention to provide the full $18 billion. Senator Muskie spoke of the President's concerns:
 
 
 36
 But may I say to (Senator Scott), when we pass a piece of legislation like this, with its requirements imposed on industry, with its requirements imposed on the States, with its requirements imposed on the local governments, the question that faces us then is, as we imposed this commitment on them, what commitment are we prepared to accept on the part of the Federal Government?
 
 
 37
 This point was well debated in the Senate when we took up this bill. I made it clear, the committee made it clear, that what we were asking of the Congress was a commitment that these people in other levels of government and the private sector could rely upon. Of course there is a commitment. The President 3 years ago, in his state of the Union message, said he had preempted the environmental issue and that he was making a commitment.
 
 
 38
 . . . . O
 
 
 39
 The conferees spent hours and days studying the problem of financing the cleanup effort required by this new legislation, and specifically studying how much money would be necessary to achieve the objective and goals of the act, as set forth in section 101(a).
 
 
 40
 118 Cong.Rec. S 18548 (daily ed. October 17, 1972). Congressman Harsha responded in a like vein:
 
 
 41
 Mr. Speaker, there is another point which I must raise. We have known all along that it would take a massive amount of money and time to reclaim and to protect our precious water resources. But, we dare not measure the cost of this water bill merely in terms of dollars alone. We cannot measure the wealth of our great natural resources in dollars alone-- and if we wait too long, all the dollars on earth won't buy back what we've lost. Under these circumstances, I am firmly convinced that the price of killing this water bill-- of sustaining this Presidential veto-- is far, far too costly.
 
 
 42
 . . . .lin
 
 
 43
 Furthermore, the President maintained that a vote to override the veto of the Water Pollution Control Act Amendments of 1972 was a vote to increase the likelihood of higher taxes. So be it, the public is prepared to pay for it. To say we can't afford this sum of money is to say we can't afford to support life on earth.
 
 
 44
 . . . .of
 
 
 45
 Mr. Speaker, this is perhaps the most important environmental legislation the Congress has yet enacted. The question is not, 'Can we afford to spend $18 billion over the next 3 years for waste treatment plants?' but 'Can we afford not to?'
 
 
 46
 118 Cong.Rec. H 10268-69 (daily ed. October 18, 1972).
 
 
 47
 The cardinal principle of interpretation is 'to give effect to the intent of Congress.' United States v. American Trucking Ass'ns, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). We have included these extensive excerpts at this point because we find in them a clear expression of legislative will. We find that it was Congress' intention that the full $18 billion be spent to control water pollution. Had the statute been clearly drawn, this would end our inquiry, if in fact one need ever have begun. Unfortunately, we must still confront the problem of the Administrator's arguable discretion to allot or not allot. We do so in the belief that the legislative history, as quoted above, manifests an intent to create a procedure which would insure that the total authorized funds would be made available to the states. It is this goal which must guide us in interpreting the funding mechanism, for if discretion in allotment would make the achievement of this goal more difficult, it must be assumed that Congress intended no such authorization. See, e.g., United States v. Congress of Industrial Organizations, 335 U.S. 106, 112, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); Vermilya-Brown Co., Inc. v. Connell, 335 U.S. 377, 388, 69 S.Ct. 140, 93 L.Ed. 76 (1948).
 
 B. The Meaning of the Harsha Amendments
 
 48
 We now turn to the analysis of 205(a) and 207, particularly with regard to the effect of the Harsha Amendments. As we indicated earlier, it is important to keep in mind the distinct stages involved in the contract-grant mechanism. Appellant-Administrator argues, primarily from the Harsha Amendements, that the Act permits discretion at the allotment phase. Appellee-City counters that while the Administrator might control the timing of future spending through delay of obligation, he must fully allot. We agree with Appellee because, after careful consideration of the relevant history, we find it clear that the Congressional intent, both before and after the Harsha amendments, was to make allotment mandatory.
 
 
 49
 Section 205(a), by its terms, supports the Appellee. It is mandatory in tone: 'Sums authorized to be appropriated pursuant to section 207 for each fiscal year . . . shall be allotted by the Administrator . . ..'
 
 
 50
 The Appellant argues that the Harsha Amendments, by adding 'not to exceed' in 207, manifest an intent to make the allotment (under 205) discretionary. However, the imposition of a ceiling on authorized appropriations is not inconsistent with the Appellees' position concerning mandatory allotment. Logically, it could be interpreted to mean that the amount obligated (later appropriated and expended) in any fiscal year may be less than the maximum amount authorized. We concede that the elimination of the word 'all' from 205(a) is a source of confusion. At least one court[18] has chosen to rely entirely upon this syntactical change, although there is no precise explanation of its meaning. We consider it more useful to examine the statements of sponsors purporting to explain the intended effect of the Harsha Amendments; we find that allotment remained mandatory.
 
 
 51
 Perhaps the clearest statement in the Congressional history is that of Senator Muskie in explaining the purpose behind the Harsha Amendments:
 
 
 52
 In our last conference, the able and distinguished ranking minority member of the House Committee on Public Works offered two amendments which he indicated would reduce opposition to the bill from the White House and the Office of Management and Budget. These two amendments were accepted by your conferees and by other House conferees in order to remove the question of a veto on the basis of the money authorized by the legislation.
 
 
 53
 Under the amendments proposed by Congressman WILLIAM HARSHA and others, the authorizations for obligational authority are 'not to exceed' $18 billion over the next 3 years. Also, 'all' sums authorized to be obligated need not be committed, though they must be allocated. These two provisions were suggested to give the administration some flexibility concerning the obligation of construction grant funds.
 
 
 54
 The conferees do not expect these provisions to be used as an excuse in not making the commitments necessary to achieve the goals set forth in the act. At the same time, there may be instances in which the obligation of funds to a particular project in a particular State may be contrary to other public policies such as the National Environmental Policy Act. In these cases the conferees would of course, expect the administration to refuse to enter into contracts for construction.
 
 
 55
 118 Cong.Rec. S 16871 (daily ed. October 4, 1972). Senator Muskie stated clearly that allotment[19] under the Act is to be mandatory.
 
 
 56
 Congressman Harsha, in explaining the meaning of his amendments, stressed that flexibility with regard to obligation was their purpose:
 
 
 57
 Furthermore, I want to point out that the elimination of the word 'all' before the word 'sums' in section 205(a) and the insertion of the phrase 'not to exceed' in section 207 was intended by the managers of the bill to emphasize the President's flexibility to control the rate of spending.
 
 
 58
 Id. at H 9122. It is our belief that Congressman Harsha, by emphasizing that the President could 'control the rate of spending,' was clearly referring to control at the obligation stage. Had the amendments been designed to confer discretion at the allotment stage, Congressman Harsha could have so stated; furthermore, the Congressman had clearly intended to obligate the entire $18 billion to meet the pollution problem[20] and his views as to the amendments must be read in light of his expressions of the total legislative intent.
 
 
 59
 The Harsha Amendments were further analyzed in a discussion among Congressmen Ford, Harsha, and Jones.[21]
 
 
 60
 MR. GERALD R. FORD. Mr. Speaker . . . I think it is vitally importnat that the intent and purpose of section 207 is spelled out in the legislative history here in the discussion on this conference report.
 
 
 61
 As I understand the comments of the gentleman from Ohio (Harsha), the inclusion of the words in section 207 in three instances of 'not to exceed' indicates that is a limitation. More importantly that it is not a mandatory requirement that in 1 year ending June 30, 1973, there would be $5 billion and the next year ending June 30, 1974, $6 billion and a third year ending June 30, 1975, $7 billion obligation or expenditure?
 
 
 62
 MR. HARSHA. I do not see how reasonable minds could come to any other conclusion that the language means we can obligate or expend up to that sum-- anything up to that sum but not to exceed that amount . . ..
 
 
 63
 MR. GERALD R. FORD. Mr. Speaker, I would like to ask the distinguished chairman of the subcommittee and the chairman of the House conferees whether he agrees with the gentleman from Ohio (Mr. Harsha).
 
 
 64
 MR. JONES of Alabama . . .. My answer is 'yes.' Not only do I agree with him, but the gentleman from Ohio offered this amendment which we have now under discussion in the committee of conference, so there is no doubt in anybody's mind of the intent of the language. It is reflected in the language just explained by the gentleman from Ohio (Mr. Harsha).
 
 
 65
 MR. GERALD R. FORD. Mr. Speaker, this clarifies and certainly ought to wipe away any doubts anyone has. The language is not a mandatory requirement for full obligation and expenditure up to the authorization figure in each of the 3 fiscal years.
 
 
 66
 Id. at H 9123.
 
 
 67
 From these statements, we draw the conclusion that the amendments were intended to grant the executive discretion in the obligation phase, not in the allotment phase. The President evinced a similar understanding in his veto message:
 
 
 68
 Certain provisions of (the bill) confer a measure of spending discretion and flexibility upon the President, and if forced to administer this legislation I mean to use those provisions to put the brakes on budget-wrecking expenditures as much as possible.
 
 
 69
 But the law would still exact an unfair and unnecessary price from the public. For I am convinced . . . that the pressure for full funding under this bill would be so intense that funds approaching the maximum authorized amount could ultimately be claimed and paid out, no matter what technical controls the bill appears to grant the Executive.
 
 
 70
 118 Cong.Rec. at S 18534-35 (daily ed. October 17, 1972). It is true that the President's statements concerning the Act are not to be given the weight accorded to statements by members of Congress. Nevertheless, it appears to have been the President's understanding that 205 and 207 conferred upon the Adminstrator only 'spending discretion and flexibility.' He evidently felt that since the sums had to be allotted and made available for obligation, public pressure could force him to obligate the funds.
 
 
 71
 After the veto, both Senator Muskie and Congressman Harsha again explained the effect of the amendments upon the allotment phase. Senator Muskie repeated his position that the Administrator must allot the sums authorized.[22] Congressman Harsha reiterated his explanation of the amendments to the House, stating:
 
 
 72
 Furthermore, Mr. Speaker, we have emphasized over and over again that if Federal spending must be curtailed, and if such spending cuts must affect water pollution control authorizations, the administration can impound the money.
 
 
 73
 I want to point out that the elimination of the word 'all' before the word 'sums' in section 205(a) and insertion of the phrase 'not to exceed' in section 207 was intended to emphasize the President's flexibility to control the rate of spending.
 
 
 74
 . . . .oinSecond, I would like to point out that the Administrator of the Environmental Protection Agency must approve plans, specifications, and estimates. This is the pacing item in the expenditures of funds. It is clearly the understanding of the managers that under these circumstances the Executive can control the rate of expenditures.
 
 
 75
 118 Cong.Rec. H 10268 (daily ed. October 18, 1972). Congressman Harsha then explained the impact of the Act in future fiscal years:
 
 
 76
 The first major impact of obligations from the $5 billion authorizations for the fiscal year ending June 30, 1973, is in fiscal year 1975.
 
 
 77
 . . . .ajo
 
 
 78
 As a matter of fact, for fiscal year 1973 if all the money were obligated and placed under contract, there would only be $20 million needed to meet the obligations . . ..
 
 
 79
 Id. It seems clear that Congressman Harsha's hypothetical concerning the obligation of the entire $5 billion requires an underlying assumption that all such sums must be allotted and thus available for obligation.
 
 C. The Administrator's Arguments
 
 80
 At this point we turn to an analysis of the Administrator's arguments. We note that basically the Administrator argues an uncontested point, i.e. that the Administrator has control over the 'rate of spending.'[23] Indeed, as we have observed supra, the appellee agrees and there is much legislative history to support this view.[24] The Administrator then argues that such conceded control over the 'rate of spending' must mean control at the allotment stage. We disagree. In view of the seriousness of the question, we shall set forth the Administrator's various arguments fully.
 
 
 81
 First, the Administrator argues, Congressman Harsha, after explaining that the effect of the amendments would be to 'emphasize the President's flexibility to control the rate of spending',[25] went on to state his belief that the President could 'control expenditures' under the Act by the 'same means' (commonly called 'impoundment') as he controlled expenditures under the Federal-Aid Highways Act[26] 23 U.S.C. 101 et seq. (1970). By this, the Administrator argues, Congressman Harsha meant that 'impoundment' includes a reduction in 'allotments,' as well as in 'obligation.' Therefore, it is argued, he intended to indicate that discretion would be available at the allotment stage. (Appellant's Brief at 11-12.) We cannot agree. As the Administrator concedes, the statement reproduced in the margin supra at note 26 'present(s) some difficulty in interpretation' (Appellant's Br. at 12) because 'impoundment' under the Federal-Aid Highways Act is achieved only by the limiting of contracts awarded (i.e. obligation). There is no possibility under that Act to reduce at the 'allotment' stage.[27] Whatever Congressman Harsha intended to explain, the two acts operate differently, and we believe that he could not have been arguing by analogy to discretion not conferred by the Highway Act. Congressman Harsha was referring to the obligation stage and not to allotment.[28]
 
 
 82
 Next the Administrator attempts to explain the seemingly clear remarks of Senator Muskie that the Administrator must allot the full amounts authorized in section 207. The Administrator argues that the Senator's statement 'must be allocated' . . . seems to contradict the changes in sections 205(a) and 207, which relate only to allotment.' (Appellant's Br. at 14.) We find this statement, appearing without explanation, meaningless. Senator Muskie was, by his own words, explaining to the Senate what the amendments meant. His words do not contradict anything at all; rather they seem to be a straightforward explanation of those amendments.
 
 
 83
 Next, the Administrator argues that Senator Muskie's remarks giving examples of instances where obligation may be controlled[29] amount to a 'non-example'. (Appellant's Br. at 14.) We do not comprehend this argument. Senator Muskie gave as an example the situation where the obligation of funds for a particular project may be contrary to 'other public policies such as the National Environmental Policy Act,' and thus monies would be properly withheld. The Administrator apparently feels that, since there exists elsewhere in the Act a power[30] in the Administrator to disapprove projects which do not comply with NEPA, Senator Muskie could not have been speaking of control of rate of spending. To the contrary, we consider this a proper illustration of the stage at which Congress intended executive control, i.e. at the obligation stage. The Senator's example supports this, and we understand it as such.
 
 
 84
 The Administrator alleges that Senator Muskie made a 'serious error' in a colloquy with Senator Dominick during post-veto discussion of the Act.[31] The appellant claims that the Senator's statement that 'there is plenty of flexibility in this bill for . . . the Congress to control spending' is at odds with the fact, not contested, that the statute does not permit 'the Committee on Appropriations itself to set a limit on the amount committed under the statute.'[32] Appellant argues, sub silentio, that Senator Muskie's basic understanding of the funding mechanism is apparently not to be trusted, and therefore, his numerous statements as to mandatory allotment are not to be credited. We find no such 'serious error.' In stating that the Appropriations Committee may 'anticipate' the amount of contract authority under the Act, we agree with appellee that Senator Muskie was apparently doing no more than stating that the Appropriations Committee could report out a particular appropriations bill which would operate prospectively to limit the Administrator's authority to obligate amounts less than previously allotted. Such a mechanism has been recognized by the Senate Appropriations Committee in at least one context.[33] In any event, we are satisfied that Senator Muskie knew that he meant when, in the same dialogue with Senator Dominick, he reiterated his understanding that "all' sums authorized to be obligated need not be committed, though they must be allocated.'
 
 
 85
 The Administrator next contends that the trial court's finding that Congress intended control over the rate of 'obligation and expenditure' and not over allotments[34] must be erroneous because he asserts, 'in terms of the impact on potential recipients control over allotmensts and control over obligations would have the same effect.' (Appellant's Br. at 21.) We disagree emphatically. Discretion over allotments necessarily confers discretion over the amount available to be spent and thus grants the executive the power to contravene the oft-stated legislative purpose to make federal money available. Could the Administrator allot $0? Happily, this is not the case, but the Administrator suggests no limit on his alleged discretion not to allot. Such authority would be greater than the power to control the rate of expenditures to which the sponsors repeatedly referred. Further, discretionaary allotment would not be consonant with the overall concern, clearly expressed,[35] of providing a total of $18 billion to combat water pollution. We find that discretion in obligation is distinctly different than discretion in allotment, and that it was only the former which this legislation was intended to confer.[36]
 
 
 86
 Finally, the Administrator makes an argument to this court not made to the trial court. He does so apparently in response to the trial court's findings and reasoning with regard to 205(b)(1) of the Act, the 'reallotment' provisions. The trial court's statement of the perceived effect of 205(b)(1) is reproduced in the margin.[37] The Administrator contends that the trial court erred in its assumption that reduced allotments have the effect of irrevocably denying state authorization while reduced obligation does not because, it is contended, allotments can be 'augmented'. (Appellant's Br. at 21.) We think that this is but another vehicle for a now familiar argument, i.e. that 'allotment' control is identical with 'obligation' control. Therefore, appellant concludes, a construction such as ours, which considers them separately must be erroneous.
 
 
 87
 We need not and do not reach the merits of this contention concerning 'augmentation'. The trial court's reasoning appears to us to be correct.[38] As to the centention of the Administrator, we further observe that the Act nowhere mentions any type of later augmentation procedure, and rather states in section 205(a) that 'the allotment for fiscal year 1973 shall be made not later than . . ..' However, believing as we do that there is a clear distinction under the Act between allotment and obligation and that there can be no discretion as to the former, we find it unnecessary to consider whether an allotment could be 'augmented' in a later fiscal year; full allotment must be made in each fiscal year.
 
 D. Section 206(f)(1)
 
 88
 Having considered the contentions of the Administrator as to the proper meaning of sections 205 and 207, we turn to yet another consideration which we find strongly supportive of our decision. It is elementary that a statute must be construed, if it is possible, to give effect to all of the provisions. E. g., United States v. Menasche, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L.Ed. 615 (1955). Section 206(f)(1) of the Act allows the Administrator to obligate funds for a particular state's project even if the funds allotted to that state have been fully obligated. This is possible provided that 'an aughorization is in effect for the future fiscal year for which the application requests payment, which authorization will insure such payment without exceeding the State's expected allotment from such authorization.' Section 206(f)(1) would have scant operative effect if the 'state's expected allotment' could not be known because the Administrator had discretion to allot only a portion of such authorization. This is further evidence of a legislative purpose to make allotmet mandatory. In keeping with the basic principal of statutory construction represented in Menasche, we can see no other way to preserve the force of 206(f)(1), save mandatory allotment.
 
 V. CONCLUSION
 
 89
 The only question[39] before this court is whether the Administrator must make full allotments under the Act. Our reading of the relevant statutory language and careful analysis of the pertinent legislative history compells us to hold that 205(a) of the Act requires the Administrator to allot the full sums authorized to be appropriated in 207;[40] therefore, the decision of the trial court is
 
 
 90
 Affirmed.
 
 
 
 [1]
 Russell B. Train, Administrator of the Environmental Protection Agency, has been substituted for William Ruckelshaus, the Administrator of the EPA at the time this action was commenced. Rule 43(c)(1), Fed.R.App.Proc
 
 
 [2]
 We provide a list of cases filed as of December 12, 1973:
 Anthony R. Martin-Trigona v. William D. Ruckelshaus, N.D.Ill., Civil Action No. 72-3944; Campaign Clean Water, Inc. v. Ruckelshaus, E.D.Va., 361 F.Supp. 689, Civil Action No. 18-73-R, reversed and remanded, Campaign Clean Water, Inc. v. Train, 489 F.2d 492 (4th Cir., 1973); Brown v. Ruckelshaus, C.D.Calif., 4 Cir., 364 F.Supp. 258; Herbert C. Klein, et al. v. Ruckelshaus, D.D.C., Civil Action No. 151-73; State of Minnesota v. United States Environmental Protection Agency, et al., D. Minn., Civil Action No. 4-73 Civ. 133; Mayor Morton Salkind, et al. v. Ruckelshaus, D.N.J., Civil Action No. 2027-72; City of Los Angeles v. Ruckelshaus, C.D.Calif., 364 F.Supp. 258; State of Texas v. Fri, W.D.Texas, Civil Action No. A-73-CA-38; State of Maine, et al. v. Robert W. Fri, et al., D.Maine, Civil Action No. 14-51;
 Letter from National Association of Attorneys General to Impoundment Mailing List, December 12, 1973; see also Appellant's Br. at 2-3.
 
 
 [3]
 Pub.Law 92-500, 86 Stat. 816, 33 U.S.C. ch. 26, 1251 et seq
 Title I of the Act provides in pertinent part:
 TITLE I-- Research and related programs
 (Declaration of Goals and Policy)
 Sec. 101. (a) The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act--
 (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;
 (2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;
 (3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;
 (4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;
 (5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;
 . . . .the
 Title II of the Act (201-212) entitled 'Grants for Construction of Treatment works' provides in pertinent part:
 . . . .f t
 Allotment
 Sec. 205. (a) Sums authorized to be appropriated pursuant to section 207 for each fiscal year beginning after June 30, 1972, shall be allotted by the Administrator not later than the January 1st immediately preceding the beginning of the fiscal year for which authorized, except that the allotment for fiscal year 1973 shall be made not later than 30 days after the date of enactment of the Federal Water Pollution Control Act Amendments of 1972. Such sums shall be allotted among the States by the Administrator in accordance with regulations promulgated by him, in the ratio that the estimated cost of constructing all needed publicly owned treatment works in each State bears to the estimated cost of construction of all needed publicly owned treatment works in all of the States. For the fiscal years ending June 30, 1973, and June 30, 1974, such ratio shall be determined on the basis of table III of House Public Works Committee Print No. 92-50. Allotments for fiscal years which begin after the fiscal year ending June 30, 1974, shall be made only in accordance with a revised cost estimate made and submitted to Congress in accordance with section 516(b) of this Act and only after such revised cost estimate shall have been approved by law specifically enacted hereafter.
 (b)(1) Any sums allotted to a State under subsection (a) shall be available for obligation under section 203 on and after the date of such allotment. Such sums shall continue available for obligation in such State for a period of one year after the close of the fiscal year for which such sums are authorized. Any amounts so allotted which are not obligated by the end of such one-year period shall be immediately reallotted by the Administrator, in accordance with regulations promulgated by him, generally on the basis of the ratio used in making the last allotment of sums under this section. Such reallotted sums shall be added to the last allotments made to the States. Any sum made available to a State by reallotment under this subsection shall be in addition to any funds otherwise allotted to such State for grants under this title during any fiscal year.
 (2) Any sums which have been obligated under section 203 and which are released by the payment of the final voucher for the project shall be immediately credited to the State to which such sums were last allotted. Such released sums shall be added to the amounts last allottted to such State and shall be immediately available for obligation in the same manner and to the same extent as such last allotment.
 Reimbursement and Advanced Construction
 Sec. 206.
 . . . .ent
 (f)(1) In any case where all funds allotted to a State under this title have been obligated under Section 203 of this Act, and there is construction of any treatment works project without the aid of Federal funds and in accordance with all procedures and all requirements applicable to treatment works projects, except those procedures and requirements which limit construction of projects to those constructed with the aid of previously allotted Federal funds, the Administrator, upon his approval of an application made under this subsection therefor, is authorized to pay the Federal share of the cost of construction of such project when additional funds are allotted to the State under this title if prior to the construction of the project the Administrator approves plans, specifications, and estimates therefor in the same manner as other treatment works projects. The Administrator may not approve an application under this subsection unless an authorization is in effect for the future fiscal year for which the application requests payment, which authorization will insure such payment without exceeding the State's expected allotment from such authorization.
 (2) In determining the allotment for any fiscal year under this title, any treatment works project constructed in accordance with this section and without the aid of Federal funds shall not be considered completed until an application under the provisions of this subsection with respect to such project has been approved by the Administrator, or the availability of funds from which this project is eligible for reimbursement has expired, whichever first occurs.
 Authorization
 Sec. 207. There is authorized to be appropriated to carry out this title, other than sections 208 and 209, for the fiscal year ending June 30, 1973, not to exceed $5,000,000,000, for the fiscal year ending June 30, 1974, not to exceed $6,000,000,000 and for the fiscal year ending June 30, 1975, not to exceed $7,000,000,000.
 
 
 [4]
 It appears that there was a substantial gap between the amounts authorized and the amounts appropriated. The Senate Committee on Public Works, in its report on its version of the Act, observed that:
 The lack of adequate funding of grants to assist States and localities in constructing sewage treatment plants is causing critical problems.
 Of the $3.4 billion authorized for this purpose by the 1966 legislation, only $2.2 billion was appropriated. The backlog of projects eligible for Federal payments has reached a total of nearly $2 billion.
 S.Rep.No.82-414, 92nd Cong., 1st Sess. 5 (1971).
 
 
 [5]
 See S.Rep.No.92-414 supra at 35
 
 
 [6]
 See Presidential Veto Message of October 17, 1972, 18 Cong.Rec. S 18534 (daily ed. October 17, 1972)
 
 
 [7]
 Letter from the President to Mr. William Ruckelshaus, dated November 22, 1972, J.A. at 15a
 
 
 [8]
 ,37 Fed.Reg. 26282 (December 8, 1972)
 
 
 [9]
 Not all commentators have agreed on a precise definition of 'impounding'. Compare Boggs, Executive Impoundment of Congressionally Appropriated Funds, 24 U.Fla.L.Rev. 221, 222 (1972) with Note, Impoundment of Funds, 86 Harv.L.Rev. 1505 n.1 (1973) and Fisher, Funds Impounded by the President: The Constitutional Issue, 38 Geo.Wash.L.Rev. 124 (1969). It is true that we are concerned here with the mechanism of contract authorization rather than direct appropriation. We today only decide whether the Act permits withholding of funds at the allotment stage. We will not, therefore, pursue the sematic argument that because of the different funding mechanism this is not an 'impoundment of funds' but rather a 'far more serious case.' See Brief of California Attorney General as Amicus Curiae at 6. The wisest course to leave the search for the proper definition of 'Impoundment' to the legal commentators
 On the subject of impoundment generally, especially the constitutional problems, see also Note, The Likely Law of Executive Impoundment, 59 Iowa L.Rev. 50 (1973); Comment, Presidential Impounding of Funds: The Judicial Response, 40 U.Chi.L.Rev. 328 (1973); Note, Protecting the Fisc: Executive Impoundment and Congressional Power, 82 Yale L.J. 1636 (1973); Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making, 43 N.C.L.Rev. 502 (1965); Church, Impoundment of Appropriated Funds: The Decline of Congressional Control Over Executive Discretion, 22 Stan.L.Rev. 1240 (1970); Fisher, Presidential Spending Discretion and Congressional Controls, 37 Law & Contemp.Prob. 135 (Winter, 1972); Stassen, Separation of Powers and the Uncommon Defense: The Case Against Impounding of Weapons System Appropriations, 57 Geo.L.J. 1159 (1969).
 The legal literature contains no detailed analysis of the precise problem sub judice. See Note, supra, 82 Yale L.J. at 1652; Note, supra, 59 Iowa L.Rev. at 55 n. 42; Note, supra, 86 Harv.L.Rev. at 1526 n. 116.
 
 
 [10]
 The arguments of plaintiff-intervenor, City of Detroit, were found by the trial court to be 'substantially the same' as those of plaintiff City, and so all arguments were treated together. City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.D.C.1973); J.A. at 53a n.3. We agree and will not differentiate between plaintiff and plaintiff-intervenor
 
 
 [11]
 City of New York, supra note 10, J.A. at 56a-63a
 
 
 [12]
 Tape of oral argument November 2, 1973, contains the following colloquy:
 Judge Wilkey: Would you like to elaborate upon the question of sovereign immunity?
 Counsel: As I understand the doctrine of sovereign immunity, as developing a close relationship between the merits and the doctrine. The exception to the doctrine which is claimed to be applicable by the plaintiff here is that the Administrator was essentially acting in violation of the statute, acting outside the scope of his authority, and therefore not acting on behalf of the sovereign but simply as an individual in excess acting outside the law who should be ordered to act within the law. Our contention is that he was acting within the statute, properly exercising his authority, therefore acting on behalf of the sovereign and if we are persuasive on the merits, then we should also win on the doctrine of sovereign immunity. The-- Now it may be and I . . .
 Judge: (Inaudible) appreciate any idea of sovereign immunity does it? If you go on that theory the sovereign is no better off than any other citizen.
 Counsel: I think we are getting close to that. There may survive a zone of plausibly legal activities where the government has a kind of special position-- a certain deference that a court will find a kind of protection of sovereign immunity reaches somewhat beyond the very strictest construction of the statute. I find the present state of the law in somewhat of a turmoil and I think this circuit has developed a number of new doctrines which throw much of recent law into question, particulary the Scanwell case and I don't think the Supreme Court has had the time to sort out the wisdom of that and the impact of that, and I--
 Judge: Are you reserving the sovereign immunity argument for the Supreme Court?
 Counsel: We are reserving the argument for the Supreme Court and we would be delighted, just delighted to prevail on it here.
 Judge: That doesn't leave you much choice in that regard does it?
 Counsel: You mean to reserve it or to--
 Judge: Yes, to reserve it.
 Counsel: Obviously the problem of the position of sovereign immunity is one that impacts not just on this case but many, many cases for the government and we are in a position where we do not win frequently at the moment on the issue of sovereign immunity, but where it is not yet responsible for us not to urge it and hopefully there will be some more authoritative pronouncements from the Supreme Court within a few years that will clarify where we stand.
 
 
 [13]
 City of New York, supra note 10, J.A. at 56a-57a
 
 
 [14]
 Appellant's Reply Brief at 2
 
 
 [15]
 'A Legislative History of the Water Pollution Control Act Amendments of 1972,' Committee Print, Committee on Public Works, 93rd Cong., 1st Sess., January 1973. Senator Muskie commented on the magnitude of the legislative task:
 I have been a Member of the Senate for 13 years, and I have never before participated in a conference which has consumed so many hours, been so arduous in its deliberations, or demanded so much attention to detail from the members. The difficulty in reaching agreement on this legislation has been matched only by the gravity of the problems with which it seeks to cope.
 
 
 [118]
 Cong.Rec. S 16869 (daily ed. October 4, 1972)
 
 
 [16]
 See, e.g., First National Bank of Logan, Utah v. Walker Bank and Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)
 Congressman Harsha is the ranking minority member of the House Committee on Public Works which reported H.R. 11896. He was the bill's floor manager and also a member of the conference committee which developed the final language of the Act.
 Senator Muskie is chairman of the Senate Subcommittee on Air and Water Pollution which reported S. 2770, the Senate version of the Act. He was floor manager for that bill and a member of the conference committee.
 
 
 [17]
 Senator Cooper was the ranking minority member of the Senate Committee on Public Works and a floor manager of the bill
 
 
 [18]
 Campaign Clean Water v. Ruckleshaus, 361 F.Supp. 689, 699 (E.D.Va.1973)
 
 
 [19]
 Senator Muskie's use of the term 'allocate' vice the term 'allot' is of no import. The Senate version of the bill had used the term 'allocate.' Appellants concede this point. See Brief for Appellant at 14
 
 
 [20]
 See Congressman Harsha's remarks at 118 Cong.Rec. H 10268-69 appearing supra at 18
 
 
 [21]
 Congressman Jones was Chairman of the House conferees and a floor manager for the bill
 
 
 [22]
 See 118 Cong.Rec. at S 18546, S 18549 (daily ed. October 17, 1972). Senator Muskie illustrated his specific understanding that all funds would be allotted by introducing a table of proposed expenditures premised entirely on full allotment. His remarks:
 With respect to the budget impact, let me give the Senate just one more factor to be included in the Record, a table showing the expenditures projected under this bill. I ask unanimous consent that it be included in the Record at this point.
 There being no objection, the table was ordered to be printed in the Rocerd, as follows:
 RATE OF EXPENDITURES BY FISCAL YEAR 1
 
 
 [1]
 1st year, 5 percent of authorization; 2d year, 20 percent of authorization;
 3rd year, 30 percent of authorization; 4th year, 40 percent of authorization;
 5th year, 5 percent of authorization.
 UNDER AUTHORIZATIONS OF S. 2770 2
 
 
 [2]
 Fiscal year 1973, $5,000,000,000; fiscal year 1974, $6,000,000,000; fiscal
 year 1975, $7,000,000,000.
 (In billions)
 -------------------------------------------------------------------------------
 Fiscal year--
 -------------------------------------------------
 1973 1974 1975 Total
-------------------------------------------------------------------------------
Fiscal year:
1973 .................. $0.25 ........................... $0.25
1974 ................... 1.00 $0.30 .......... 1.30
1975 ................... 1.50 1.20 $0.35 3.05
1976 ................... 2.00 1.80 1.40 5.20
1977 .................... .25 2.40 2.10 4.75
1978 ..................................... .30 2.80 3.10
1979 ....................................................... .35 .35
 ---------------------------------------------------------------
 Total ................ 5.00 6.00 7.00 18.00
-------------------------------------------------------------------------------
 
 
 [118]
 Cong.Rec. S 18547 (daily ed. October 17, 1972)
 
 
 [23]
 We note, for example, that the caption of the Administrator's discussion of legislative history reads:
 C. The Legislative History of Sections 205 and 207 Makes it Clear that Congress Understood that they were Designed to Confer Control Over the Rate of Spending on the Administrator.
 Appellant's Br. at 11.
 
 
 [24]
 See, e.g., remarks of Congressman Harsha at 118 Cong.Rec. H 9122 (daily ed. October 4, 1972) reproduced fully supra
 
 
 [25]
 Id
 
 
 [26]
 Furthermore, let me point out, the Committee on Public Works is acutely aware that moneys from the highway trust fund have been impounded by the Executive. Expenditures from the highway trust fund are made in accordance with similar contract authority provisions to those in this bill. Obviously expenditures and appropriations in the water pollution control bill could also be controlled. However, there is even more flexibility in this water pollution control bill because we have added 'not to exceed' in section 207, as I indicated before
 Surely, if the administration can impound moneys from the highway trust fund which does not have the flexibility of the language of the water pollution control bill, it can just as rightly control expenditures from the contract authority produced in this legislation by that same means.
 
 
 [118]
 Cong.Rec. H 9122 (daily ed. October 17, 1972). See also 118 Cong.Rec. H 10268 (daily ed. October 18 1972)
 
 
 [27]
 Called 'apportionment' in the Highway Act. See 23 U.S.C. 104 (1970)
 
 
 [28]
 We note that it is unclear whether Congressman Harsha was aware of the district court dicision in State Highway Commission of Missouri v. Volpe, 347 F.Supp. 950 (W.D.Mo.1972), aff'd, 479 F.2d 1099 (8th Cir. 1973). If he had an understanding of that decision which did not allow impounding at the obligation stage, he would have known that the Highway Act, with its different mechanisms, could not be an analog to the Act here. We point this out only to say that while we endeavor to read his words as he spoke them, there was, in fact, a court decision then in existence which had fully and carefully analyzed the Highway Act
 
 
 [29]
 The conferees do not expect these provisions to be used as an excuse in not making the commitments necessary to achieve the goals set forth in the Act. At the same time, there may be instances in which the obligation of funds to a particular project in a particular State may be contrary to other public policies such as the National Environmental Policy Act. In these cases the conferees would, of course, expect the Administration to refuse to enter into contracts for construction
 
 
 [118]
 Cong.Rec. S 16871 (daily ed. October 4, 1972)
 
 
 [30]
 See 203 of the Act
 
 
 [31]
 Mr. Dominick. Is my understanding correct that the amount authorized here is still subject to the appropriation process? Mr. Muskie. Funds are made available through contract authority which is subject to the control of the President and also the Committee on Appropriations. Yes. As a matter of fact, may I say to the Senator that the conferees adopted an amendment proposed by Congreessman Harsha to indicate clearly the intent of Congress with respect to that point. Mr. Dominick. And so the Committee on Appropriations could by its action determine what contract authority the President would have. Is that correct?
 Mr. Muskie. Under the amendments proposed by Congressman William Harsha and others, the authorizations for obligational authority are 'not to exceed' $18 billion over the next 3 years. Also, 'all' sums authorized to be obligated need not be committed, though they must be allocated. These two provisions were submitted to give the administration some flexibility concerning the obligation of construction grant funds. Mr. Cooper. Mr. President, will the Senator yield briefly? I would like to be sure we are clear on this matter.
 Mr. Muskie. I yield.
 Mr. Cooper. Did I understand the question of the Senator from Colorado to be whether the Appropriations Committee could set a limit on the amount to be obligated?
 Mr. Dominick. That is the question I asked. I understood from the Senator from Maine that the answer was in the affirmative; that the Appropriations Committee could set that limit.
 Mr. Cooper. I thank the Senator. Out of this $24 billion $6 billion is not subject to contract obligation. Is that correct? Mr. Muskie. The Senator is correct. Mr. President, may I say in addition to the Senator from Colorado the amount of contract authority may be anticipated by the Appropriations Committee. That is, years in the future up to 1975 the Committee on Appropriations may set amounts which the administration may obligate in advance. So there is plenty of flexibility in this bill for the President and the Congress to control spending.
 Mr. Dominick. I think the Senator for clarifying the record.
 
 
 [118]
 Cong.Rec. S 18546 (daily ed. October 17, 1972)
 
 
 [32]
 Appellee's Br. at 28; Appellant's Br. at 17
 
 
 [33]
 See Senate Committee on Appropriations, Department of Transportation and Related Agencies Appropriations, S.Rep.No. 92-271, ,92nd Cong., 1st Sess. 25-6 (1971)
 
 
 [34]
 City of New York v. Ruckleshaus, supra n. 10, J.A. at 66a
 
 
 [35]
 See, e.g., text at 12-19 supra
 
 
 [36]
 Of course, it could be argued that discretion at any stage could contravene that basic purpose of the Act, i.e. to provide $18 billion to meet the pollution problem. We express no opinion as to whether or to what extent the Administrator could legally withhold funds at the obligation stage; that question must await future resolution. Compare Georgia v. Nixon, No. 63, 414 U.S. 810, 94 S.Ct. 25, 38 L.Ed.2d 45, Original, motion denied, (1973). See n.39 infra
 
 
 [37]
 Another feature of the Act which is of some importance in the resolution of issues before the Court is the reallotment provision in 205(b)(1) of the Act. Once allotted to a State, sums are available for obligation for approved projects there 'for a period of one year after the close of the fiscal year for which such sums are authorized.' if for any reason the sums allotted are not fully obligated within that period, they are to be reallotted 'generally on the basis of the ratio used in making the last allotment of sums under this section.' Such reallotment sums remain available for obligation and are added to the State's allotment for the next fiscal year. Any sums authorized but not allotted at the appropriate time are lost to the State under the provisions of this Act. Thus, by refusing to allot the full sums authorized, the Administrator controls the absolute amount (as opposed to the rate) of spending without regard to the standards set forth in, e.g., 204, for determining whether sums should be obligated
 New York City v. Ruckleshaus, supra n. 10; J.A. at 55a.
 
 
 [38]
 Accord, campaign Clean Water v. Ruckleshaus, 361 F.Supp. 689 (E.D.Va.1973) reversed on other grounds, Campaign Clean Water v. Ruckleshaus, No. 73-1745 (4th Cir. December 10, 1973)
 
 
 [39]
 There is no constitutional question in this case. Both sides have agreed that if this court determines that the Act requires full allotment there remains no constitutional power in the executive to limit the allotments because, in the words of appellant, 'Allotment . . . is not an act that of itself commits the government to any obligation.' (Appellant's Reply Br. to Supplemental Br. of Appellee at 2.) See also Supplemental Br. of Appellee at 3-6. Compare Georgia v. Nixon, et al., No. 63, 414 U.S. 810, 94 S.Ct. 25, 38 L.Ed.2d 45, Original, motion denied, (1973) which attempted to raise the question of the constitutionality of refusal to obligate
 
 
 [40]
 $5 billion for fiscal year 1973 and $6 billion for fiscal year 1974